SPACE AGE PRODUCTS, INC., a
Corporation of the State of
Ohio, Plaintiff,

v.

James H. GILLIAM, Jr., Individually and in his official capacity as Secretary of the Department of Community Affairs and Economic Development of the State of Delaware; Frances M. West, Individually and in her official capacity as Director, Division of Consumer Affairs, Department of Community Affairs and Economic Development, State of Delaware, Defendants.

Civ. A. No. 79–225.

United States District Court,
D. Delaware.

April 17, 1980.

Joseph M. Bernstein, Brown, Shiels & Barros, Wilmington, Del., for plaintiff.

Wheeler K. Neff, and Christopher J. Curtin, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

Plaintiff, an Ohio corporation, brings this action under 42 U.S.C. § 1983 (1974) against two State officials charged with enforcement of Delaware's consumer protection laws. Plaintiff markets household products through a distribution scheme which requires the recruitment of Area Representatives who, after an initial investment of $19.50, are entitled to purchase plaintiff's products at a discount for resale to others. Purchase of $600.00 of Space Age products entitles an Area Representative to Charter Membership in the organization. Charter Members are entitled to a higher discount and are also authorized to sell Charter Memberships, for which they receive a bonus of $150.00. (Opinion of the Consumer Affairs Board, Oct. 15, 1979). The marketing plan is described to potential participants at public recruitment meetings.

Following an investigation of the Space Age organization, the Division of Consumer Affairs ("the Division") concluded that the marketing scheme employed by plaintiff was a "pyramid or chain distribution scheme" as defined by 6 Del.C. § 2561 (1975).[1] Two representatives of the Divi-

---

1. That statute provides:

As used in this subchapter:

(1) "Pyramid or chain distribution scheme" means a sales device whereby a person, upon a condition that he part with money, property or any other thing of value, is granted a franchise license, distributorship or other right which person may further perpetuate the pyramid or chain of persons who are granted such franchise, license, distribu-

sion then attended a public recruitment meeting on April 20, 1979. At the conclusion of the meeting, plaintiff's representatives were arrested for criminal violations of the pyramiding statute, 6 Del.C. § 2563 (1975), and plaintiff and its representatives were served with a Cease and Desist Order issued under the authority of the Division [2] and signed by defendants. The Order directed plaintiff to

. . . immediately cease and desist from engaging in the below enumerated business practice. . . .

USE OF A PYRAMID OR CHAIN DISTRIBUTION SCHEME in connection with the solicitation of investments of money. The Violators employed a pyramid or chain distribution scheme, as defined by 6 Del.C. § 2561(1), in connection with the solicitation of the investment of six hundred dollars per consumer, for membership in Space Age Products, Inc. Membership in Space Age Products, Inc. entitles consumers to perpetuate the chain of consumers who invest in Space Age Products, Inc. . . .

The above Order is based upon the following:

The Violators personally promoted and attempted to sell participation in Space Age Products, Inc. to Mr. David Byler at the residence of Mr. David Yoger, on April 5, 1979. Space Age Products, Inc., is a pyramid or chain distribution scheme as defined by 6 Del.C. § 2561(1). . . .

Plaintiff then filed this action and appealed the cease and desist order to the Consumer Affairs Board. The Board found that the marketing plan did violate Section 2561 and upheld the Order on October 15, 1979. On the same day, a Superior Court jury found Space Age and a number of its employees guilty of promoting a pyramid scheme. Those decisions are on appeal.

In this case the plaintiff asserts that the issuance under 29 Del.C. § 8612 of the cease and desist order without prior notice and an opportunity to be heard violated its rights under the First and Fourteenth Amendments. It alleges that as a result of that wrongful issuance it was forced to cease all of its business in Delaware and lost substantial revenues.

The defendants have moved to dismiss or for summary judgment on a number of grounds, including sovereign immunity, official immunity, abstention, and failure to allege a violation of rights protected by the Constitution.

## I. SOVEREIGN IMMUNITY.

◾ The defendants have been sued in their official as well as their individual capacities and, as an initial matter, argue that this Court lacks jurisdiction over the claims asserted against them in their official capacities by reason of the Eleventh Amendment. The Eleventh Amendment bars actions against a non-consenting State whether or not the State is a nominal party, so long as the State is a "real, substantial party in interest" in the sense that any damage award could be assessed against the State Treasury. *Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). There is no dispute that a judgment against these defendants in their official capacities would be paid by the State, so the question becomes one of consent to suit.

◾ Plaintiff argues that the State has waived its immunity defense by enacting

torship or right upon such condition. A limitation as to the number of persons who may participate, or the presence of additional conditions upon the eligibility for such a franchise, license, distributorship or other right recruit [*sic*] or upon the receipt of profits therefrom, does not change the identity of the scheme as a pyramid or chain distribution scheme.

(2) "Person" includes an individual, corporation, trust, estate, partnership, unincorporated association, or any other legal or commercial entity. (6 Del.C.1953, § 2561; 59 Del.Laws, c. 86, § 1.)

2. 29 Del.C. § 8612(a)(1) (1979).

Chapter 40 of Title 10 of the Delaware Code. The first section of that legislation, 10 Del.C. § 4001 (1978 Supp.), provides:

§ 4001. Limitation On Civil Liability.

Except as otherwise provided by the Constitutions or laws of the United States or of the State, as the same may expressly require or be interpreted as requiring by a court of competent jurisdiction, no claim or cause of action shall arise, and no judgment, damages, penalties, costs or other money entitlement shall be awarded or assessed against the State or any public officer or employee, including the members of any board, commission or agency of the State, whether elected or appointed, and whether now or previously serving as such, in any civil suit or proceeding at law or in equity, or before any administrative tribunal, where the following elements are present:

(1) The act or omission complained of arose out of and in connection with the performance of an official duty requiring a determination of policy, the interpretation or enforcement of statutes, rules or regulations, the granting or withholding of publicly created or regulated entitlement or privilege or any other official duty involving the exercise of discretion on the part of the public officer, employee or member, or anyone over whom the public officer, employee or member shall have supervisory authority;

(2) The act or omission complained of was done in good faith and in the belief that the public interest would best be served thereby; and

(3) The act or omission complained of was done without gross or wanton negligence;

provided that the immunity of judges, the Attorney General and Deputy Attorneys General, and members of the General Assembly shall, as to all civil claims or causes of action founded upon an act or omission arising out of the performance of an official duty, be absolute; provided further that in any civil action or proceeding against the State or a public officer, employee or member of the State, the plaintiff shall have the burden of proving the absence of 1 or more of the elements of immunity as set forth in this section.

The next section of the statute provides for indemnification against "any expenses, . . . judgments, fines and costs," incurred by "any public officer, employee or member who, but for the application of any provision of the Constitutions or laws of the United States or the State to the contrary, would be entitled to immunity in accordance with Section 4001 of this Chapter . . . ." 10 Del.C. § 4002 (1978 Supp.). Section 4004, 10 Del.C. § 4004 (1978 Supp.), sets forth the procedure for establishing a right of indemnification and makes clear that no right of indemnification exists if "[one] or more of the elements of immunity set forth in Section 4001 of this Chapter" is absent.[3]

The legislative "Synopsis" to the statute sheds some light on its purpose:

*Synopsis.* This Act has two basic purposes: first, by codifying existing common law standards, to discourage law suits which create a chilling effect on the ability of public officials and employees to exercise the far reaching decision-making authority which complex government demands of them; and conversely, to make clear that public officers and employees are fully liable where there [*sic*] exercise of authority is grossly negligent, the product of bad faith, or outside the scope of their official duties. The Act also recognizes that there exists [*sic*] certain causes of action, principally of federal origin, which may result in personal liability of a public official, good faith and apparent authority notwithstanding. Indemnification for expenses incurred by the public officials in such instances is provided for. The scheme for immunity and indemnification is extended to the

---

**3.** Thus, the chapter provides for indemnification of State employees in a very limited set of circumstances, i. e., where the three elements of Section 4001 are present, but some other state or federal law does away with the immunity granted in that section.

780

officers and employees of political subdivisions, except that such subdivision must provide the funds for indemnifying the employees within their jurisdiction. The right of the State, its agencies and political subdivisions to insure against the risks of indemnification is recognized but not mandated.

Plaintiff argues that this legislation was intended to waive Delaware's Eleventh Amendment immunity from suit in the federal courts. I reach a contrary conclusion. It is true that Section 4001 contemplates a situation in which a plaintiff in a civil action, by proving the absence of one of the enumerated elements, may recover against the State. It does not follow, however, that the legislative intent behind this section was to waive sovereign immunity and to expose the State to liabilities which would not otherwise exist. Such a reading is not required because federal and other state statutes do waive sovereign immunity in specified situations[4] and the recoveries against the State contemplated by Section 4001 may be those in cases involving those situations. Moreover, a reading which implies a waiver of sovereign immunity would seem to conflict with the legislative Synopsis as well as with the title chosen by the General Assembly for Section 4001. The Synopsis indicates that the General Assembly had two purposes in mind: to codify what it felt to be the existing law of official immunity and to provide indemnification in those limited situations where a damage recovery is possible despite the presence of good faith. Section 4001 was drafted to accomplish the former purpose, a purpose consistent with its title "Limitation of Liability", but inconsistent with the purpose of increasing the State's exposure to damage liability.

The Supreme Court of the United States has held:

In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909).

*Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974). Here I find no such clear declaration. To the contrary, the language of the statute and its legislative history suggest that it deals solely with official immunity and indemnity in those situations where sovereign immunity, for some independent reason, does not apply. The claims against the defendants in their official capacities, accordingly, will be dismissed.

## II. ABSTENTION.

■ The defendants next argue that, in view of the pending State court proceedings, this Court should abstain from exercising jurisdiction over this case. An analysis of the respective State and federal claims is necessary to evaluate this argument.

The gravamen of plaintiff's federal action is that it should have been afforded a hearing before the cease and desist order issued. It does not contest the power of the State to issue such orders; nor does it contest the constitutionality of the Pyramid or Chain Distribution Statute. It does not seek to enjoin enforcement of the order, see *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), or to enjoin state criminal or quasi-criminal proceedings, see *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). It seeks only declaratory relief and damages for violation of its claimed right to procedural safeguards.

By contrast, the only issue presently before the state courts with respect to the cease and desist order is whether or not it should continue in effect. The parties to the State proceedings are concerned with the question of whether plaintiff's marketing practices violated the statute and there is no reason to suppose that the state tribunals will have occasion to consider whether

4. *E. g.*, 18 Del.C. § 6511.

the issuance of the cease and desist order should have been preceded by a hearing. Conversely, this Court will have no reason to consider the State law question in determining the constitutional claims presented here. In sum, no grounds for abstention are present in this case, and defendants' motion to dismiss on that basis must be denied.

## III. THE EFFECT OF THE STATE DETERMINATIONS.

Turning to the substance of plaintiff's claims, the initial inquiry is whether the determinations by the Board and the Superior Court that plaintiff's mode of doing business was illegal bars any relief on the claims asserted in this Court. Defendants maintain that those determinations collaterally estop plaintiff from asserting that its conduct and speech have been lawful. Since the illegal character of the plaintiff's business operation has been established, defendants further argue, it follows that it has no interest in its business or commercial speech which is protected by the First or Fourteenth Amendments.

■■ I may assume for present purposes that plaintiff is collaterally estopped from asserting in this action that its merchandising technique is lawful in Delaware. The flaw in defendants' argument is its implicit assumption that the First and Fourteenth Amendment provide no protection for illegal speech or interests in illegal enterprises. Such is not the case. The First Amendment requires that at least certain forms of allegedly illegal or otherwise unprotected speech be accorded procedural protections until such time as there is a final adjudication that the speech is illegal or unprotected. E. g., Vance v. Universal Amusement Co., —— U.S. ——, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980); Carroll et al. v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Similarly, the Due Process Clause provides procedural protection for interests in alleged contraband property until such time as the property is judicially determined to be contraband. E. g., Calero-Toledo et al. v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); Menkarell v. Bureau of Narcotics, 463 F.2d 88 (3rd Cir. 1972).

■ The issue in this case is whether procedural rights guaranteed by the First and Fourteenth Amendments were violated at the time of the issuance of the cease and desist order. The illegal nature of the enterprise, even if that characterization be accepted, is not dispositive of the issue posed.[5]

## IV. THE DUE PROCESS CLAIM.

■ The threshold question from a due process perspective is whether the issuance of the cease and desist order deprived plaintiff of a "liberty" or "property" interest as those words are used in the Fourteenth Amendment. I hold that it did not.

The Pyramid or Chain Distribution Statute does not "deprive anyone of any realistic freedom" to sell household products, see New Motor Vehicles Bd. v. Orrin W. Fox Co., 439 U.S. 96, 113, 99 S.Ct. 403, 414, 58 L.Ed.2d 361 (1978) (Blackmun, J., concurring); and the unilateral expectation of profits to be derived from a particular sales scheme does not rise to the level of a "property" interest protected by the Fourteenth Amendment. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Had the State summarily revoked a previously granted license to engage in, or other approval of, a specified business activity, the case might be a different one. Compare Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589 (3d Cir. 1979). But this statute is nothing more than an economic regulation of the manner in which goods may be marketed in Delaware, and as such, it implicates no liberty or property interest protected by the Due Process Clause. Cf. New Motor Vehicles

---

5. Of course, the Board's decision upholding the cease and desist order may be relevant to the issue of damages. See Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

*Board of California v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978).

## V. THE FIRST AMENDMENT CLAIM.

When originally enacted in 1965, the consumer fraud sections of the Delaware Code were enforceable only by the Attorney General through injunction proceedings in the Court of Chancery. 6 Del.C. § 2523, 55 Del.Laws c. 46 (1965). Neither he nor any other agency had the right to issue cease and desist orders, though the expressed intent of the General Assembly was that "such [fraudulent] practices be swiftly stopped . . ." 6 Del.C. § 2512, 55 Del. Laws c. 46. Five years later, the General Assembly created the Division of Consumer Affairs and gave that Division the power to issue cease and desist orders against violations of 6 Del.C. §§ 2513 (unlawful practices) and 2532 (deceptive trade practices). 29 Del.C. § 8612, 57 Del.Laws c. 583 (1970).

The Pyramid or Chain Distribution sections were added in 1973 by 59 Del.Laws c. 86, after a legislative finding that "substantial economic losses to participating distributors have occurred and will inevitably occur by reason of their reliance on the perpetuation of a pyramid or chain distribution scheme as a source of profit . . ." The use of such a scheme was explicitly declared to be an unlawful practice under § 2513, and thus subject to the cease and desist powers of the Division of Consumer Affairs. 6 Del.C. § 2562.

Cease and desist orders are issued by the Director of the Division of Consumer Affairs. Their effect is similar to that of a court issued injunction. If one disobeys such an order, a judge of the Superior Court, after hearing "evidence as to the acts complained of," may punish him or her for contempt "in the same manner and to the same extent" as if the contempt had been committed before that court or with reference to its process. 29 Del.C. § 8612(a), 8613(b)(3). The statute does not stipulate the pre-issuance procedure to be utilized by the Director but does require that the order be in writing, state the viola-

tions which are the basis for its issuance, and be "served upon the violator." 29 Del.C. § 8612. Upon being served, the alleged violator must cease the stipulated conduct, but he or she is provided with an immediate appeal to a Board of three members. The Board is required by its rules to hold, within twenty days of the filing of the notice of appeal, a hearing at which the alleged violator may be represented by counsel and may present evidence. Neither the statute nor the rules specify any limitation on the time in which the Board's decision must be rendered. Finally, an aggrieved party may appeal a decision of the Board to the Superior Court within thirty days. 29 Del.C. § 8614.

Thus, during the pendency of the appeal to the Board, the alleged violator who claims that his method of doing business does not come within the scope of the pyramid distribution statute must cease doing business in that manner or risk citation for contempt. Moreover, while no Delaware court has yet so held, it seems likely that a contempt hearing would provide an opportunity to prove that one did not do any of the acts prohibited by the cease and desist order, but not an opportunity to contend, as the plaintiff here does, that the acts prohibited by that order were not violations of the statute. Thus, the order has the immediate effect of making the cited party choose between foregoing the challenged mode of doing business and risking the imposition of punishment.

Plaintiff claims that Delaware cannot constitutionally curtail its right to commercial free speech without providing it with notice of the conduct claimed to violate the statute and a hearing on, and determination at a meaningful time of, the legality of its manner of doing business. Defendants deny that any First Amendment interests are implicated by its approach to the pyramid distribution problem and assert that, in any event, the right to a hearing within twenty days after personal service of the order and the filing of an appeal to the Board satisfies any procedural requirements which can reasonably be in-

ferred from the First Amendment. I conclude that the First Amendment does require procedural safeguards in this context and that the safeguards required include a hearing on and determination of the legality of the challenged activity before or immediately following the issuance of a cease and desist order. Since there is evidence from which one could infer that Delaware's scheme as applied to plaintiff did not provide these required safeguards, defendants' motion to dismiss and for summary judgment must be denied.

It is important at the outset to ascertain the target of the statute and the cease and desist order. To the extent the statute and implementing order prohibit the transaction of business on the terms which come within the statutory definition of a "pyramid or chain distribution scheme," they are aimed at a course of conduct rather than the communication of information or ideas. To be sure, there can be no such transaction of business without communication of some kind, so the prohibition of the course of conduct inevitably has an incidental effect on communication also. But this incidental effect does not trigger the kind of First Amendment analysis applied to legislation aimed at communication of information and ideas. As the Supreme Court has observed ". . . it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949). If the incidental effect on communication is necessary to the attainment of a valid State interest which supports the conduct prohibition, this kind of legislation is uniformly upheld. *E. g., Giboney v. Empire Storage & Ice Co., supra; United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

There is another aspect to the Pyramid Distribution statute and the cease and desist order, however. The statute makes it unlawful to "promote" a pyramid or chain distribution scheme and plaintiff, reason-

ably I believe, reads the cease and desist order as prohibiting its practice of holding group meetings to describe its method of doing business and to solicit participants. While this does not, of course, render the Delaware statute as applied to plaintiff invalid, it renders applicable the analysis developed in the recent line of "commercial speech" cases.

The cease and desist order is a prior restraint on speech. As plaintiff correctly points out, proponents of legislative schemes involving prior restraints on speech have traditionally carried an extraordinarily heavy burden and such schemes, when sanctioned at all, have been approved only when accompanied by strict procedural safeguards. *Vance v. Universal Amusement Co.*, —— U.S. ——, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980). *See* Monaghan, *First Amendment "Due Process"*, 83 Harv.L.Rev. 518 (1970). Those procedural safeguards required by the case law have been summarized by Professor Tribe:

. . . (1) The burden of proof must rest on government to justify any restraint on free expression prior to its judicial review and on government to demonstrate the particular facts necessary to sustain a limitation on expressive behavior; (2) The administrator of a censorship or licensing scheme regulating speech activities must act within a specified brief period of time; (3) The administrator of a censorship or licensing scheme must be required, by statute or authoritative judicial construction, either to issue a license or to go to court to restrain unlicensed expressive acts; mere denial of the license cannot create an enforceable legal bar to expressive activities; (4) No ex parte court order is valid if an adversary hearing on the question of interim relief is practicable; (5) "Any restraint imposed in advance of a final judicial determination on the merits must be . . . limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution;" (6) A scheme of censorship or licensing must assure a "prompt final judi-

cial decision" reviewing any "interim and possibly erroneous denial of a license;" (7) If a prior restraint is ordered by a court, the state must either stay the order pending its appeal or provide immediate appellate review.

Tribe, *American Constitutional Law* 734–735 (1978) (footnotes omitted). The cases upon which plaintiff relies, however, have arisen in the context of types of speech other than commercial. While purely commercial speech is no longer outside the purview of the First Amendment, the Supreme Court has cautioned against extending traditional First Amendment doctrine "automatically to this as yet uncharted area." *Friedman v. Rogers*, 440 U.S. 1, 10 n. 9, 99 S.Ct. 887, 895, 59 L.Ed.2d 100 (1979). It has expressly noted the

> "commonsense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech . . . [W]e instead have . . . afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

*Ohralik v. Ohio State Bar Ass'n.*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). This distinction is based on the recognition that

> certain features of commercial speech differentiate it from other varieties of speech in ways that suggest that "a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired." . . . Because it relates to a particular product or service, commercial speech is more objective, hence more verifiable, than other varieties of speech. Commercial speech, because of its importance to business profits, and because it is carefully calculated, is also less likely than other forms of speech to be inhibited by proper regulation.

*Friedman v. Rogers, supra,* 440 U.S. at 10, 99 S.Ct. at 894.

In particular, the Supreme Court has strongly hinted that the "subordinate position" of commercial speech and its resistance to "chill" may render "inapplicable the prohibition against prior restraints." *Virginia Board of Pharmacy v. Virginia Consumers Council, Inc.*, 425 U.S. 748, 772 n. 24, 96 S.Ct. 1817, 1831, 48 L.Ed.2d 346 (1976). One commentator has read this hint as "implicitly" approving "the use of prior restraints such as cease and desist orders to enforce administrative determinations of advertising deceptions." *Note: First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine*, 44 U.Chi.L.Rev. 205, 239 (1976). But the issue before me is not whether commercial advertising or solicitation may be regulated or whether a State may use administratively imposed prior restraints in doing so. As earlier noted, plaintiff acknowledges the State's authority to do both. The issue is whether adequate procedural safeguards have been invoked.

██ The fact that commercial speech is distinguishable from other forms cannot be allowed to obscure the Court's recognition of a public interest in free commercial expression which demands First Amendment protection. It follows that the public has an interest in minimizing the frequency and duration of erroneously imposed prior restraints on commercial speech. For this reason I think we may expect the Supreme Court to insist that a State may "go no further in imposing a prior restraint on . . . [commercial] speech than is reasonably necessary to accomplish . . . [its] remedial objective," and must provide such traditional safeguards with respect to those restraints as are not inconsistent with its ability to achieve its important and legitimate objectives.[6]

██ Delaware has a substantial interest in protecting its citizens against the "economic losses" which its General Assembly has found will "inevitably occur by reason

---

6. *Beneficial Corp. v. F. T. C.*, 542 F.2d 611, 619 (3rd Cir. 1976).

of . . . [imprudent] reliance on the perpetuation of a pyramid or chain distribution scheme," and it clearly may outlaw such schemes. Moreover, the geometric progression inherent in such schemes enables their perpetuators to involve large numbers of people in a short period of time. The resulting interest of the State in the immediate termination of such a scheme upon its detection, in my judgment, would justify the issuance of a cease and desist order without a prior hearing. These interests of the State, however, cannot justify an administrative scheme which on its face fails to guarantee a prompt determination of whether the speech involved is within the ambit of the prohibition and which, as applied in this case, did not produce such a decision for ninety days after the hearing.

I do not suggest that plaintiff can challenge Delaware's scheme other than as applied to it [7] and the present record does not disclose all of the circumstances which caused the Board's determinations to follow the issuance of the cease and desist order by six months. The fact that the delay occurred, however, is sufficient to preclude summary judgment for the defendants.

## VI. OFFICIAL IMMUNITY.

Official immunity is an affirmative defense. The proponent of such a defense has the burden of satisfying the Court "(1) that he or she acted in good faith without any intention of violating the plaintiffs' constitutional or other legally recognized rights and (2) that a reasonable person would not have realized that his or her actions would violate a well established constitutional right." *Masjid Muhammad-D. C.C. v. Keve*, 479 F.Supp. 1311, 1320 (D.Del. 1979). Under *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978),

the second, or "objective" prong, of the applicable legal test involves three distinct questions: (1) was the right violated "a clearly established constitutional right" at the time of the challenged conduct? (2) would a reasonable person in the defendant's position have known enough about the law to be aware of that right? and (3) would a reasonable person in the defendant's position have known enough about the facts to have realized that his conduct would violate that right? If it appears that the right which the official is found to have violated was not a "clearly established" one at the time and that the official acted in subjective good faith, he or she is entitled to immunity from damage liability. *Procunier v. Navarette, supra.*

The virtual absence of any law on First Amendment "due process" in the context of commercial speech amply demonstrates that if defendants are found to have violated a First Amendment right of the plaintiff that right should not be considered "clearly established." Defendants have supplied no competent evidence, however, from which the Court could conclude that they acted in good faith.[8] Accordingly, summary judgment cannot be entered on the plaintiff's damage claim.

---

7. The Supreme Court has declared the overbreadth doctrine inapplicable to commercial speech. *Bates v. State Bar*, 433 U.S. 350, 381, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977); *Village of Schaumburg v. Citizens for a Better Environment*, —— U.S. ——, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). Assuming, as I do, that this holding applies to procedural overbreadth, I conclude that plaintiff could not challenge the

failure of the scheme to require a prompt determination if it in fact had received one or if its failure to receive one was attributable to its own conduct.

8. Neither defendant has filed an affidavit. Further record development will be required on this issue as well as upon the issues of the process accorded plaintiff and its damages.