**GREATER CLEVELAND WELFARE RIGHTS ORGANIZATION et al., Plaintiffs,**

v.

**Samuel BAUER et al., Defendants.**

Civ. A. No. C78–728.

United States District Court,
N. D. Ohio, E. D.

Dec. 21, 1978.

Lloyd B. Snyder, Jane E. Bielefeld, M. Umar Abdullah, Richard Gurbst, Carolyn C. McTighe, Cleveland, Ohio, for plaintiffs.

David A. Williamson, Cleveland, Ohio, Thomas W. Hess, Asst. Atty. Gen., Geoffrey E. Webster, Dept. of Public Welfare, Columbus, Ohio, for defendants.

## MEMORANDUM, OPINION AND ORDER

CONTIE, District Judge.

Invoking the Court's jurisdiction under 28 U.S.C. § 1343(3) and (4), plaintiff Greater Cleveland Welfare Rights Organization instituted the present action "on behalf of its members and all persons similarly situated." By this action, equitable relief is sought for an alleged violation of the right of privacy as secured by the United States Constitution and Section 7 of the Privacy Act of 1974, Pub.L.No.93–579, 88 Stat. 1846, 1909 (codified at 5 U.S.C. § 552a note).

## I. PROCEDURAL HISTORY

The complaint in the instant action was filed upon the granting of plaintiff Greater Cleveland Welfare Rights Organization's motion to proceed in *forma pauperis* on June 23, 1978. Contemporaneously with the filing of its complaint, said plaintiff moved for certification of the present action as a class action and for a temporary restraining order "enjoining defendants Bauer and the Cuyahoga County Welfare Department from using or disclosing to any party social security numbers of plaintiff

class members or any information obtained due to prior use or disclosure of said numbers."

The Court denied plaintiff's motion for a temporary restraining order by its Order of June 26, 1978. Further, by its Order of July 7, 1978, the Court, finding that the named plaintiff was not a member of the class it sought to represent, denied its motion to certify this action as a class action. Subsequently, the Court granted plaintiff's motion for leave to file an amended complaint adding Minnie Player as a named plaintiff. The Court also granted Ms. Player's motion to certify the present action as a class action. The class represented by Ms. Player consists of all present and future Aid to Families with Dependent Children (AFDC) recipients within the State of Ohio.

The defendants in the present action are Kenneth Creasy, individually and in his capacity as Director, Ohio Department of Public Welfare; Samuel Bauer, individually and in his capacity as director of the Cuyahoga County Welfare Department; and the Cuyahoga County Welfare Department.

The hearing of plaintiffs' motion for preliminary injunction was consolidated with the trial on the merits of this action. The Court duly heard testimony and received exhibits on July 23, 1978. At the close of said hearing, the Court denied plaintiffs' motion for a preliminary injunction. The following shall constitute the Court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

## II. FACTS

The AFDC program was first established in 1935. Said program provides benefits to families with a needy child:

(1) who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and (as determined by the State in accordance with standards prescribed by the Secretary) a student regularly attending a school, college, or university, or regularly attending a course of vocational or technical training designed to fit him for gainful employment; . . .

Social Security Act of 1935 § 406(a), 42 U.S.C. § 606(a). Said benefits are for the benefit of the dependent child and include payments or medical care to meet the needs of said child and also payments or medical care to meet the needs of the relative with whom said child is living. See Social Security Act of 1935 § 406(b), 42 U.S.C. § 606(b). The State of Ohio participates in the AFDC program pursuant to Ohio Rev.Code Ann. § 5107.03 (Page Supp.1978).

In order to receive AFDC benefits it is necessary for a person responsible for needy dependent children to complete an "Application For Aid For Dependent Children" (commonly referred to as a "dec" form), both upon initial application and thereafter at six month intervals. Prior to 1975, the dec form in use in Ohio requested the social security number of only the individual completing it. On August 1, 1975, an amendment to the Social Security Act became effective that mandated state welfare departments obtain social security numbers for all applicants or recipients of AFDC benefits. Thereafter, the dec form was changed to require listing of the social security numbers of all individuals in the "Assistance Group." Below the space provided for said social security numbers, the dec form contains the following:

Please note: As a condition of eligibility for ADC, you must furnish a Social Security account number for each person in need of ADC regardless of age. Someone from your County Welfare Department will assist you in applying for a number for anyone who does not have one.

The above quoted statement is the only information found on the dec form regarding the social security number requirement.

Among the information applicants are required to furnish on the dec form is the following:

(19) (EARNINGS) DO YOU OR YOUR HUSBAND OR WIFE, OR ANY OF THE ADC CHILDREN, HAVE EARNINGS FROM ANY KIND OF WORK?

If the applicant responds in the affirmative to the above question, he then must complete a chart for each person over age 14 having such earnings. Completion of said chart requires the provision of, among other things, the name of the person employed, the name and address of the employer, the number of hours and days worked per week, and the individual's gross earnings.

The Social Security Administration retains computerized wage reports, indexed by social security number, for all individuals for whom social security contributions are made. In approximately 1974, the State of Ohio began making inquiries to the Social Security Administration concerning the possibility of matching the social security numbers of all AFDC recipients in Ohio with the social security numbers of all individuals for whom the Social Security Administration had earnings information. The purpose of such a match would be to verify the information provided by AFDC recipients in response to item (19) of the dec form.

On December 20, 1977, Section 411 of the Social Security Act of 1935, 42 U.S.C. § 611, became effective:

(a) Notwithstanding any other provision of law, the Secretary shall make available to states and political subdivisions thereof wage information contained in the records of the Social Security Administration which is necessary (as determined by the Secretary in regulations) for purposes of determining an individual's eligibility for aid or services, or the amount of such aid or services, under a state plan for aid and services to needy

families with children approved under this part, and which is specifically requested by such state or political subdivision for such purposes.

(b) The Secretary shall establish such safeguards as are necessary (as determined by the Secretary under regulations) to insure that information made available under the provisions of this section is used only for the purposes authorized by this section.

Thereafter, the Ohio Department of Public Welfare submitted to the Social Security Administration the social security numbers of all individuals over the age of sixteen receiving AFDC benefits during the month of January 1978. These approximately 806,000 social security numbers were then matched with the social security numbers of all individuals for whom the Social Security Administration had earning records for the period of January through June of 1977. The Social Security Administration then returned to the Ohio Department of Public Welfare a list of all the social security numbers for which they had earnings data. For each social security number returned, the Social Security Administration listed the employer's name and address and the gross earnings reported for that number. The Ohio Department of Welfare then pulled from its March 1978 data base the case number, the name, address, date of birth, recipient number, sex, and grant amount for all social security numbers returned by the Social Security Administration.

Thereafter, the Ohio Department of Public Welfare instructed each of the county welfare departments to name one person within its office to serve as "SSA Match List Coordinator." The various match list coordinators were then provided with match list printouts for their counties along with a detailed "Procedure For Working Match Lists." [1]

---

1. The match list printouts contained the information provided by the Social Security Administration (the employer's name and address and the gross earnings reported for the matched social security number) and the information from the Ohio Department of Welfare files

(case number, name, address, date of birth, recipient number, sex, and grant amount) for all social security numbers matched. As explained by the department in its instructions to the various county welfare departments, the

The match list coordinators were instructed to check the employment information contained in the files of the matched cases with employment information contained on the match list printouts. If a match list coordinator discovered a discrepancy between the information in the recipient's file and the information on the match list printout, the next step was to contact the recipient and request permission to seek information from the employer listed on the printout. Such employer would thereafter be contacted regardless of whether the recipient granted permission for such contact.[2] The employer would be asked to confirm that the recipient was an employee and the amount of his gross income.

The ultimate goal of the match program is reference of cases of fraud to county prosecutors. The Ohio Department of Public Welfare's instructions to the match coordinators included the following:

A determination as to whether there is probable cause to believe that the crime of fraud has been committed will be made by the county welfare director or his designate in each instance where the client has willfully failed to meet his reporting responsibilities. Probable cause will exist when the applicant or recipient has:

(A) Knowingly and with intent to deceive or defraud, made a false statement to obtain aid, to obtain a continuance of, an increase in aid or to avoid a reduction in aid; and/or

(B) Knowingly and with intent to deceive or defraud, failed to disclose facts which could have resulted in denial, reduction or discontinuance of aid; and/or

(C) Accepted aid knowing he was not eligible, or accepted aid knowing it was greater than the amount to which he is entitled.

When the CWD determines that there is probable cause to believe that the crime of fraud has been committed, the county welfare department director shall refer the case to the county prosecutor.

A number of cases have now been referred to various county prosecutors. Others are still being "worked" by the match coordinators and future referrals are expected.

By the present action, plaintiffs seek a declaratory judgment as follows:

a. that defendants' action in securing, using and disclosing to third parties social security numbers of ADC recipients and information derived therefrom, without complying with the requirements of § 7 of the Privacy Act, is illegal and unlawful, and in violation of plaintiff class members' constitutional right of privacy;

b. that defendants' use of any and all information gained from the illegal collection and dissemination of ADC recipients' social security numbers violates § 7 of the Privacy Act of 1974 and the United States Constitution.

Further, they seek an order enjoining defendants from:

a. securing, using and disclosing to third parties, social security numbers of

---

match procedure was not without possibility of erroneous matches:

The accuracy of this SSA wage earnings match is dependent upon the accuracy of the social security numbers which ODPW has in its data base. If ODPW initially gave an incorrect social security number to SSA, the information coming back from the Social Security Administration will be for a wage earner other than the recipient. The other wage earner's information will be identified as the recipient's because ODPW's data base has the other wage earner's social security number identified as the recipient's. The Social Security Administration gave ODPW social security numbers only; SSA did not give a name associated with the SSN. The name which appears on the computer printout has been supplied from data base to match the social security number returned by the Social Security Administration. Because of the great opportunity for bad matches, the county welfare department emphasizes the necessity for careful verification and casework during this project.

2. The Court does not consider the fact that some individuals granted defendants permission to contact their alleged employers significant. If any cognizable injury to plaintiffs' rights occurred, it occurred prior to the request for said permission.

ADC recipients without complying with the requirements of § 7 of the Privacy Act of 1974; ·

b. seeking social security numbers from any new applicant for ADC benefits until and unless defendants first provide said persons with all information required by § 7 of the Privacy Act of 1974;

c. using or disseminating any and all information derived from the collection and dissemination of ADC recipients' social security numbers where such collection and dissemination were done without complying with the requirements of § 7 of the Privacy Act.

Finally, they seek an order:

compelling defendants to expunge any and all social security numbers or information derived from the use or disclosure of social security numbers obtained from members of the class.

Plaintiffs do not seek any relief in regard to those cases that have thus far been referred to county prosecutors.

On July 20, 1978, the Ohio Department of Public Welfare notified the various county welfare departments that from that date forth they should have all AFDC recipients, in conjunction with the completion of dec forms, sign a document captioned "Notification/Release Of Information About Social Security Numbers." Said documents recite the fact that furnishing a social security number is a requirement of the AFDC program; list the statutory authority that permits the welfare department to request social security numbers; and contains the following statement regarding how the social security numbers will be used:

Your social security number will be used as a means of identification in the administration of the ADC or medicaid programs. It will be used to determine your initial or continuing eligibility when contacting other people or agencies in order to obtain or verify information necessary to determine your eligibility and to determine that all public assistance regulations have been met.

## III. DISCUSSION

### A.

■ Initially the Court will consider plaintiffs' assertion that the use of their social security numbers in the match program without their prior permission was violative of their constitutional right to privacy. The Court finds this assertion to be without merit.

The Supreme Court had occasion to discuss the Constitutional right of privacy in *Paul v. Davis,* 424 U.S. 693, 712–13, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976):

While there is no "right of privacy" found in any specific guarantee of the Constitution, the Court has recognized that "zones of privacy" may be created by more specific constitutional guarantees and thereby impose limits upon government power. See *Roe v. Wade,* 410 U.S. 113, 152–153 [93 S.Ct. 705, 35 L.Ed.2d 147] (1973). Respondent's case, however, comes within none of these areas. He does not seek to suppress evidence seized in the course of an unreasonable search. See *Katz v. United States,* 389 U.S. 347, 351 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967); *Terry v. Ohio,* 392 U.S. 1, 8–9 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968). And our other "right of privacy" cases, while defying categorical description, deal generally with substantive aspects of the Fourteenth Amendment. In *Roe* the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are "fundamental" or "implicit in the concept of ordered liberty" as described in *Palko v. Connecticut,* 302 U.S. 319, 325 [58 S.Ct. 149, 82 L.Ed. 288] (1937). The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

In the present case, plaintiffs assert that the constitution was violated when defend-

ants used the social security numbers of class members in the match program without having previously informed them of such intended use. As in *Paul,* this is "very different" from the rights which have been recognized as "fundamental" or "implicit in the concept of ordered liberty." It is clear that defendants' activities cannot be viewed as violative of any right to privacy protected by the constitution. *See Jaffess v. HEW,* 393 F.Supp. 626, 629 (S.D.N.Y.1975).

### B.

The Court need next turn to plaintiffs' contention that defendants' utilization of the social security numbers of the class members in the match program without prior permission to do so was violative of Section 7 of the Privacy Act of 1974. Further, the Court must determine whether such violation entitles plaintiffs to the relief requested.

Section 7 provides in relevant part as follows:

> (b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.

At the outset, it is clear, at least up until July 20, 1978, that defendants were requiring the members of plaintiffs' class to reveal their social security numbers and not providing the information required by Section 7(b). The real issue presented by this case, however, is whether Section 7(b) affords plaintiffs a private cause of action for its violation and, if so, for what relief.

Section 7(b) is silent on the issue of enforcement of the rights afforded by it. If plaintiffs do have a private cause of action, therefore, it must be implicit in the existence of Section 7(b).

■ There are several factors to be considered on the issue of implied private causes of action: (1) whether the provision asserted creates an especial right in the plaintiff, (2) whether the action of Congress in the field indicates an intent to allow such a remedy or at least an intent not to deny the remedy, (3) whether implication of the remedy would be consistent with the purpose of the right asserted, and (4) whether the cause of action implied would be one appropriate for federal law. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975); *Davis v. Passman,* 571 F.2d 793, 797 (5th Cir. 1978); *Guran Co. v. City of Akron,* 546 F.2d 201, 204 (6th Cir. 1976).

■ Initially, in regard to the first and fourth above listed factors, Section 7(b) does create an especial right in plaintiffs and the class they represent and a cause of action to enforce said right does not appear to be of a type traditionally relegated to state law. It is clear that in enacting Section 7(b), Congress intended to insure that individuals in the position of plaintiffs and their class could make an informed decision on whether to comply with a request for their social security numbers and to protect such individuals from unauthorized uses of said numbers.[3] Further, it does not appear that state law provides any relief for individuals in the position of plaintiff class members. Rather, this case presents an instance similar to that feared by the Supreme Court, in a different context, in *J. I. Case Co. v. Borak,* 377 U.S. 426, 434–35, 84 S.Ct. 1555, 1561, 12 L.Ed.2d 423 (1964): "[If] the law of the State happened to attach no responsibility to the use of misleading proxy statements, the whole purpose of [§ 14(a) of the Securities Exchange Act of 1934] might be frustrated." In the absence of a cause of action to enforce Section 7(b) in the federal courts, said section would provide an empty right with no means of

---

**3.** As stated in the legislative history, "[t]his provision is intended to permit an individual to make an informed decision whether or not to disclose the social security account number, and it is intended to bring recognition to, and discourage, unnecessary or improper uses of that number." *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, printed in* 120 Cong.Rec. S21, 817 (daily ed. Dec. 17, 1974) *and in* 120 Cong.Rec. H12, 243 (daily ed. Dec. 18, 1974).

enforcement. Such would clearly frustrate the intent of Congress.

Although the first and fourth factors to be considered focus, to some degree, on the right involved, the second and third factors appear to require more direct consideration of the type of remedies sought. Plaintiffs in the present case seek two types of remedies; prospective relief in the form of an Order requiring specific disclosure in the future, and relief for defendants' past failure to make such disclosure in the form of an Order preventing further use of information acquired through the match program.

While the legislative history is silent as to any intention to create either a prospective remedy or a remedy for past violations, there is nothing to indicate a disapproval of such actions. See *Ass'n of Data Processing v. Fed. H. Loan Board,* 568 F.2d 478, 484 (6th Cir. 1977).[4]

The final consideration is whether the remedies sought would be consistent with the purpose of the right asserted. The Court is convinced that inferring a right of action for prospective relief is consistent with the purposes of Section 7(b). Such relief will permit individuals in the position of plaintiff class members to make an informed decision on the question of whether to provide defendants with their social security numbers. Further, said relief will discourage defendants from unnecessarily and improperly using the social security numbers in their possession.

■ The court, however, does not believe that the relief requested by plaintiffs for the past use of social security numbers is appropriate. Initially, it is clear that the use made of the social security numbers by defendants is not per se impermissible. Rather, the only error committed by defendants was their failure to comply with Section 7(b). Although, as stated previously, Section 7(b) was intended both to afford individuals the opportunity to make an informed decision on whether to reveal their social security number, and to discourage improper use of such numbers, it would appear that the problem of improper use was the prime moving force behind said enactment. In fact, one court has termed the situation in which disclosure of the intended use of social security numbers had not been made but in which the use made of such numbers was otherwise proper, "only a technical violation." *McElrath v. Califano,* Civil Number 77 C 3194 (N.D.Ill. May 23, 1978).

The only purpose that could possibly be served by this Court forbidding defendants from making further use of information gained through the match program is the deterrence of future requests for social security numbers without compliance with Section 7(b).[5] The Court is confident that the granting of prospective relief alone will accomplish the same result without the huge waste of effort and funds that would result from an Order forbidding further use of information gained from the match program.

### C.

Having concluded that Section 7(b) affords plaintiffs an implied right of action

---

4. *See Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, printed in* 120 Cong.Rec. S21, 817 (daily ed. Dec. 17, 1974) *and in* 120 Cong.Rec. H12, 243 (daily ed. Dec. 18, 1974).

5. In this regard, such a remedy would serve a purpose similar to that theoretically served by the "exclusionary rule" in the context of violations of the Fourth Amendment. *But see Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 413, 91 S.Ct. 1999, 2013, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting). There is an important distinction, however, between violations of the Fourth Amendment and violations of Section 7(b) of the Privacy Act. There is a significant motivation for police officers to violate the Fourth Amendment in their pursuit of individuals guilty of violating the criminal law. There is no such motivation for violations of Section 7(b) by individuals in the position of defendants. In fact, it appears that their positions would be better served by fully informing applicants for AFDC benefits, at the outset, of the possible consequences of fraud and the efforts to be undertaken to detect incidents thereof. By providing such information, defendants would be in a position of preventing fraud before its occurrence rather than trying to discover it afterwards.

for prospective relief, the only issue remaining is whether the present action was rendered moot by the Ohio Department of Public Welfare's notification to the various county welfare departments on July 20, 1978, that in the future all AFDC recipients should sign a "notification/Release of Information About Social Security Numbers." The Court concludes that it was not.

As stated previously, said documents contain the following description of the uses to be made of social security numbers:

> Your social security number will be used as a means of identification in the administration of the ADC or Medicaid programs. It will be used to determine your initial or continuing eligibility when contacting other people or agencies in order to obtain or verify information necessary to determine your eligibility and to determine that all public assistance regulations have been met.

The Court believes that Section 7(b) requires a meaningful disclosure. It does not consider the disclosure now in use meaningful. To comply with Section 7(b), the Court finds, it is necessary to inform recipients that their social security numbers will be used to verify employment information supplied on the dec form with the Social Security Administration. Said disclosure must also include a statement that if the records of the Social Security Administration reveal that the employment information supplied on the dec form is not accurate, the AFDC recipient may be subject to prosecution for fraud.

## IV.  CONCLUSION

Based on the foregoing, the Court concludes that defendants have in the past violated, and are continuing to violate, Section 7(b) of the Privacy Act of 1974. The Court further concludes that plaintiffs are entitled to relief in the form of an order requiring defendants to, in the future, comply with Section 7(b) of the Privacy Act of 1974. The defendants are hereby ordered to submit, within ten days of the date of this opinion, a proposed disclosure of the intended uses to be made of social security numbers supplied by AFDC recipients. Plaintiffs shall file any objections to said proposed disclosure within five days thereafter.

IT IS SO ORDERED.