OPINION
 

 LATCHUM, Chief Judge.
 

 In this § 1983 suit, plaintiff, John B. Doyle, Jr., has filed a two count complaint seeking compensatory and punitive damages from two employees of the Justice of the Peace Court and a New Castle County Police Officer for alleged deprivation of his constitutional rights, arising from two separate incidents. In addition, plaintiff asks this Court to enjoin the police officer and any other employees of the police department from further unspecified harassment and from causing him additional damages. Plaintiff’s claims were tried to the Court on December 8, 1981. This opinion represents the Court’s findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.
 

 I.
 
 Social Security Number Claim
 

 On October 20, 1980, Doyle was issued a summons by a New Castle County police officer for failure to remain stopped at a stop sign. Doyle contested the ticket, but was found guilty by Judge Johnson in Justice of the Peace Court No. 11 on November 6, 1980 and assessed a fine and . costs of
 
 *1341
 
 $19.50. Doyle paid the sum, but appealed the conviction to Superior Court. On March 17, 1981, the Deputy Attorney General filed a notice of nolle prosequi with the Superior Court citing insufficient evidence as the basis for the dismissal of the appeal.
 

 Thereafter, Doyle sent his wife to Justice of the Peace Court No. 11 to obtain a refund of the $19.50 which Doyle had previously paid. Mrs. Doyle was advised by Deborah Salter, Chief Clerk of the Court, that because over 30 days had passed since the fine had been paid, a cash refund could not be given and it would be necessary to request the State Treasurer to issue a check to Doyle. For this purpose, the clerk’s office would submit a routine voucher to the State Treasurer’s office containing Doyle’s name, address, phone number and social security number for identification purposes, and information pertinent to the court proceeding and the subsequent nolle prosequi. Salter requested Mrs. Doyle to have her husband contact the clerk’s office directly to prepare the necessary papers.
 

 Doyle subsequently telephoned Salter, but refused to reveal his social security number. When Salter asked Doyle the reason for his refusal, Doyle replied that it was “none of her business” and that it was “a private matter.” On March 30, 1981, Salter duly submitted the refund voucher without Doyle’s social security number. One day later, Salter received a memorandum from Phyllis Wilson, a secretary in the Administrative Office of the Justice of the Peace Court, through which the voucher had been routed, advising her that the State Treasurer’s Office would not accept the voucher without the recipient’s social security number. A copy of this memorandum was transmitted to Doyle.
 

 Doyle filed this suit on April 4, 1981, alleging that his right to privacy had been infringed by the Justice of the Peace Court’s refusal to refund the $19.50 without disclosure of his social security number. (Docket Item [“D.I.”] 1.) The complaint, as originally filed, sought compensatory and punitive damages from, and an award of costs and attorney’s fees against, the State of Delaware, and an order enjoining the Police Department of New Castle County from any further harassment of Doyle. On June 22, 1981, this Court dismissed plaintiff’s complaint on grounds of sovereign immunity, inadequate factual basis for jurisdiction, lack of personal jurisdiction over New Castle County, and failure to comply with the pleading requirements of the federal rules. (D.I. 11.) The Court subsequently granted relief from judgment and allowed Doyle to amend his . complaint to substitute the proper parties. (D.I. 16.) As to that portion of the complaint alleging infringement of his right to privacy, Doyle named Deborah Salter and Phyllis Wilson as defendants. (D.I. 18.) After suit was filed and prior to the amendment of plaintiff’s complaint, the State Treasurer refunded the $19.50 to Doyle without first compelling disclosure of his social security number.
 
 [1]
 

 Both at trial and in their earlier pretrial motions, defendants Salter and Wilson concentrated their efforts solely on establishing affirmative defenses to this suit, most notably the defense of official immunity. The Court agrees, for the reasons discussed later in this opinion, that these defendants are immune from personal damage liability and, therefore, this portion of plaintiff’s suit, which seeks only damages and not declaratory or injunctive relief, is barred. Nonetheless, the Court feels constrained to address at the outset the merits of plaintiff’s underlying claim in order to give some guidance to the State Treasurer’s Office as to its obligations under federal law and to forestall the filing of similar suits in the future.
 

 
 *1342
 
 A.
 
 Right To Privacy
 

 Generally, the constitutional right to privacy embodies solely “those personal rights that can be deemed fundamental or implicit in the concept of ordered liberty.”
 
 McElrath v. Califano,
 
 615 F.2d 434, 441 (C.A.7, 1980),
 
 quoting Roe v. Wade,
 
 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). The activities ordinarily embraced by this definition relate to the intimate facets of an individual’s personal life, namely, marriage, procreation, contraception, family relationships, child rearing or education.
 
 Paul v. Davis,
 
 434 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976);
 
 Jaffess v. Secretary, Dept. of Health, Ed. & Welfare,
 
 393 F.Supp. 626, 629 (S.D.N.Y. 1975). The courts accordingly have held, and this Court concurs in that view, that mandatory disclosure of one’s social security number does not so threaten the sanctity of individual privacy as to require constitutional protection.
 
 See McElrath v. Califano, supra,
 
 615 F.2d at 441;
 
 Greater Cleveland Wel. Rights Org. v. Bauer,
 
 462 F.Supp. 1313, 1318-19 (N.D.Ohio 1978);
 
 Cantor v. Supreme Court of Pennsylvania,
 
 353 F.Supp. 1307,1321-22 (E.D.Pa.),
 
 aff’d without opinion,
 
 487 F.2d 1394 (C.A.3, 1973);
 
 Conant v. Hill,
 
 326 F.Supp. 25, 26 (E.D.Va. 1971).
 

 The lack of constitutional support for plaintiff’s argument does not end the Court’s inquiry, however, because the utilization of social security numbers is regulated to some extent by federal statute. In the factual posture presented by this case, two statutory provisions are pertinent: Section 7 of the Privacy Act of 1974 and a 1976 amendment to the Social Security Act, codified at 42 U.S.C. § 405(c)(2)(C).
 

 Section 7 of the Privacy Act broadly prohibits a state from penalizing an individual in any way because of his failure to reveal his social security number upon request, except in certain narrowly defined circumstances. This provision states in relevant part:
 

 (a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual’s refusal to disclose his social security account number.
 

 (2) the provisions of paragraph (1) of this subsection shall not apply with respect to—
 

 ******
 

 (B) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.
 

 (b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.
 

 5 U.S.C. § 552a note.
 

 In enacting Section 7, Congress sought to curtail the expanding use of social security numbers by federal and local agencies and, by so doing, to eliminate the threat to individual privacy and confidentiality of information posed by common numerical identifiers.
 
 See
 
 S.Rep.No. 1183, 93rd Cong., 2d Sess.
 
 reprinted in
 
 [1974] U.S. Code Cong. & Ad.News 6916, 6944. Underlying this legislative effort was the recognition that widespread use of a standard identification number in collecting information could lead to the establishment of a national data bank or similar informational system, which could store data gathered about individuals from many sources and facilitate government surveillance of its citizens.
 
 Id.
 
 at 6944-45, 6957. It was anticipated that as use of the social security number proliferated, the incentive to consolidate records and to broaden access to them by other agencies of government would in all likelihood correspondingly increase.
 
 Id.
 
 at 6945. Thus, Congress saw a need for federal legislation to restore to the individual the option to refuse to disclose his social security number without repercussion, except in
 
 *1343
 
 the specifically delineated circumstances outlined in section 7(a)(2).
 

 The 1976 amendment to the Social Security Act, adopted after the passage of the Privacy Act, furnishes an additional exception to the statutory protection generally accorded to those people who refuse to disclose their social security numbers. That amendment states:
 

 (i) It is the policy of the United States that any State (or political subdivision thereof) may, in the administration of any tax, general public assistance,
 
 driver’s license, or motor vehicle registration law
 
 within its jurisdiction, utilize the social security account numbers issued by the Secretary for the purpose of establishing the identification of individuals affected by such law, and may require any individual who is or appears to be so affected to furnish to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved, the social security account number (or numbers, if he has more than one such number) issued to him by the Secretary.
 

 if: # # % * *
 

 (iii) For purposes of clause (i) of this subparagraph, an agency of a State (or political subdivision thereof) charged with the administration of any general public assistance, driver’s license, or motor vehicle registration law which did not use the social security account number for identification under a law or regulation adopted before January 1,1975, may require an individual to disclose his or her social security number to such agency solely for the purpose of administering the laws referred to in clause (i) above
 

 42 U.S.C. § 405(cX2)(C)(i) and (iii) (emphasis added).
 

 Drawing from the language of section 7 and section 405(c)(2)(C), the Court concludes that the State Treasurer’s practice of requiring the disclosure of social security numbers, for the purpose of securing a refund of a motor vehicle fine, could pass muster only if the following elements were proved. First, the practice of mandatory disclosure must fall within either of the two pertinent statutory exceptions described above: (1) it must be incident to the administration of a state driver’s license or motor vehicle registration law under 42 U.S.C. § 405; or (2) disclosure of the social security number on refund vouchers must be required under a statute or regulation adopted prior to January 1, 1975, under a system of records in existence and operating before that date pursuant to section 7(a)(2) of the Privacy Act. Second, besides proving either of these two elements, the State Treasurer would have the additional burden of demonstrating compliance with section 7(b) of the Privacy Act, viz., that refund applicants tendering their social security numbers are provided with the following information: whether disclosure is mandatory or voluntary, by what statute or other authority such number is solicited, and what uses will be made of it.
 

 The Court cannot discern on the present record whether mandatory disclosure of Doyle’s social security number could qualify as part of the administration of Delaware’s driver’s license law, although common sense suggests that this interpretation may be logically sound. Similarly, although testimony was presented at trial establishing that disclosure of the social security number on refund vouchers was required under a long-standing practice of the State Treasurer’s Office originating before January 1, 1975, defendants could point to no statute or regulation specifically authorizing this practice. Administrative practice alone, however, unsupported by any discrete legal grant of authority, ,is not enough to satisfy the requirements of section 7(a).
 
 Wolman v. United States Selective Service System,
 
 501 F.Supp. 310, 311 (D.D.C.1980). Conceivably, the absence of sufficient proof on either of these issues could be attributed to defendants’ tactical decision to focus on their affirmative defenses and not to an actual inability to show compliance with these federal statutory provisions, if necessary. Such evidence, ac
 
 *1344
 
 eordingly, might be forthcoming in a more suitable litigation context, in which injunctive or declaratory relief is sought. Without such supporting evidence, however, the State Treasurer’s practice of requiring disclosure of social security numbers would be deemed to violate federal law.
 
 See Brookens v. United States,
 
 627 F.2d 494, 497-98 (C.A.7, 1980);
 
 McElrath v. Califano,
 
 615 F.2d 434, 440 (C.A.7, 1980);
 
 Green v. Philbrook,
 
 576 F.2d 440, 445-46 (C.A.2, 1978);
 
 Doe v. Sharp,
 
 491 F.Supp. 346, 348 — 19 (D.Mass.1980);
 
 Greater Cleveland Wel. Rights Org. v. Bauer,
 
 462 F.Supp. 1313 (N.D.Ohio 1978).
 

 In addition, the Court doubts that in requiring the disclosure of social security numbers on vouchers as a matter of course, the State Treasurer has complied with the requirements of section 7(b) of the Privacy Act. As noted previously, this section imposes an affirmative obligation on state agencies to inform individuals who have been requested to disclose their social security numbers of certain information, including the uses to which the number will be put. In enacting this specific measure, Congress intended to “permit an individual to make an informed decision whether or not to disclose the social security account number” and “to bring recognition to, and discourage, unnecessary or improper uses of that number.” Analysis of House and Senate Compromise Amendments to the Federal Privacy Act,
 
 printed in
 
 120 Cong.Rec. S21,817 (Dec. 17, 1974) and in 120 Cong.Rec. H12,243 (Dec. 18, 1974),
 
 quoted in Greater Cleveland Wel. Rights Org. v. Bauer, supra,
 
 462 F.Supp. at 1319 n.3. Thus, adequate explanations of the information required by section 7(b) is critical to the right afforded by section 7(a) to withhold disclosure of the' social security number, except in limited circumstances.
 

 The voucher routinely used by the Justice of the Peace Court for refunds of motor vehicle fines, which is submitted to the State Treasurer, nowhere indicates whether disclosure of the social security number is voluntary or mandatory, by what statutory or other authority such number is solicited, or what uses will be made of it. In this case, Doyle himself, after refusing to disclose his number, eventually was informed of the relevant information — that disclosure was mandatory pursuant to a practice of the State Treasurer’s Office, and that the number would be used merely for identification purposes. The requirements of section 7(b) are not fulfilled, however, when no affirmative effort is made to disclose this information
 
 at
 
 or
 
 before
 
 the time the number is requested and a citizen, like Doyle, must instead pry the pertinent facts from a state agency.
 
 Doe v. Sharp,
 
 491 F.Supp. 346, 350 (D.Mass.1980). In addition, there is no indication that individuals who fail to question the use of their social security number on the voucher are in any way apprised of the explanations required by section 7(b). Thus, it is apparent that a more “meaningful disclosure” of the information listed in section 7(b) must be provided by the State Treasurer’s Office in advance to those individuals required to reveal their social security numbers in order to conform to federal law.
 
 See Greater Cleveland Wel. Rights Org. v. Bauer, supra,
 
 462 F.Supp. at 1320.
 

 Of course, an assessment of damages against these defendants does not automatically follow from a finding that the State Treasurer and Justice of the Peace Court failed to comply with the requirements of section 7. At least one Court has questioned whether section 7 can support a private right of action for retrospective relief.
 
 See Greater Cleveland Wel. Rights Org. v. Bauer, supra,
 
 462 F.Supp. at 1320. The Court need not reach this thorny issue, however, because it finds that damages against Salter and Wilson are barred in any event by the doctrine of official immunity.
 

 B.
 
 Official Immunity
 

 An action in federal court for damages against a state officer acting in his official capacity is barred by the Eleventh Amendment because such an action, if successful, depletes the state treasury and is tantamount to a suit against the state.
 
 Edelman v. Jordan,
 
 415 U.S. 651, 663, 94
 
 *1345
 
 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974);
 
 Laskaris v. Thornburgh,
 
 661 F.2d 23, 25 (C.A.3, 1981). The Eleventh Amendment does not bar an award of damages against a state official sued in his individual capacity, however,
 
 Laskaris v. Thornburgh, supra,
 
 at 26, and Doyle’s suit against defendants Salter and Wilson may be maintained on that basis, subject of course to the affirmative defense of official, or good faith, immunity.
 

 Generally, in order to establish the defense of official immunity a state officer must prove by a preponderance of the evidence: (1) that he acted without any malicious intention to violate a constitutional privilege or other legally recognized right held by the plaintiff; and (2) that he did not know and reasonably could not have realized that his actions would cause a deprivation of constitutional rights or other legal injury.
 
 Skehan v. Board of Trustees of Bloomsburg State College,
 
 538 F.2d 53, 62 (C.A.3),
 
 cert. denied,
 
 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976);
 
 Skomorucha v. Wilmington Housing Authority,
 
 504 F.Supp. 831, 836 (D.Del.1980);
 
 Space Age Products, Inc. v. Gilliam,
 
 488 F.Supp. 775, 785 (D.Del.1980);
 
 Masjid Muhammad-D. C.C. v. Keve,
 
 479 F.Supp. 1311, 1320 (D.Del. 1979). The test for determining the existence of good faith immunity necessarily combines a consideration of both subjective and objective factors, including the state of mind of the official, the scope of discretion and responsibilities entrusted to the official, and all the circumstances as they reasonably appeared at the time of the events in question.
 
 Wood
 
 v.
 
 Strickland,
 
 420 U.S. 308, 321-22, 95 S.Ct. 992, 1000-01, 43 L.Ed.2d 214 (1975);
 
 Scheuer v. Rhodes,
 
 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974);
 
 Masjid Muhammad-D.C.C. v. Keve, supra,
 
 479 F.Supp. at 1320. After carefully reviewing these various elements, the Court concludes that defendants Salter and Wilson have adequately discharged their burden of proof on this issue and are immune from personal damage liability.
 

 First, it is clear that in implementing the State Treasurer’s practice of requiring social security numbers on voucher forms, neither defendant acted with a malicious intention to violate plaintiff’s legal rights. Both defendants testified that they had no reason whatsoever to suspect that Doyle’s rights were being violated and there is nothing in the record to suggest that this subjective belief was not sincere.
 

 Second, the evidence firmly establishes that these defendants did not know and reasonably could not have recognized that their actions transgressed federal law. In determining whether this “objective prong” of the official immunity test is satisfied, courts in this district have asked three questions: (1) was the right allegedly violated clearly established at the time of the challenged conduct; (2) would a reasonable person in the defendant’s position have known enough about the law to be aware of that right; and (3) would a reasonable person in the defendant’s position have known enough about the facts in question to have realized that his conduct violated that right.
 
 Space Age Products, Inc. v. Gilliam, supra,
 
 488 F.Supp. at 785;
 
 Masjid Muhammad-D. C.C. v. Keve, supra,
 
 479 F.Supp. at 1321.
 

 Even assuming arguendo that Doyle’s refusal to disclose his social security number was a clearly established right, the Court cannot conclude that a reasonable person in Salter’s and Wilson’s respective positions would have been aware of that right and would have recognized that any effort to compel disclosure of the number or to deny Doyle his refund violated federal law. The use of social security numbers as a means of identification, both in private commercial transactions and in citizen communications with government, is commonplace, despite Congressional efforts to curb expanding compulsory disclosure of the number. The requirements of section 7 of the Privacy Act have not been so widely disseminated, moreover, as to become an integral part of the public consciousness. To the contrary, the average citizen automatically reveals his social security number on a myriad of forms in the course of his daily life, never questioning the propriety of forced disclosure or suspecting that in many situations the number may be withheld at his option.
 

 
 *1346
 
 In addition, there is no cause to believe that a reasonable individual in Salter’s or Wilson’s position would be privy to information beyond that available to the average citizen which would lead her to question the practice of mandatory disclosure. At the time that the events upon which liability is predicated occurred, the practice of requiring social security numbers on vouchers had been in force since at least 1966 and had gone unchallenged for that 15-year period. Salter, who had worked in the Justice of the Peace Court for seven years at the time, had routinely processed applications for refunds with the social security number provision, and had no reason to doubt the legality of that requirement. Wilson joined the Administrative Office of the Justice of the Peace Court on March 2,1981, less than one month before Doyle sought his refund, and was informed at that time by her superiors that the State Treasurer’s Office would not accept refund vouchers without the applicant’s social security number. Likewise, based on past procedure and common experience, Wilson had no cause to question the propriety of compulsory disclosure.
 

 The Court thus concludes that notwithstanding the merits of plaintiff’s underlying right to privacy claim, defendants Salter and Wilson have demonstrated by a preponderance of the evidence that they each are entitled to the defense of official immunity. Judgment will be entered for defendants on this portion of plaintiff’s complaint.
 

 II.
 
 Search and Seizure Claim
 

 Doyle’s second claim arises from another alleged motor vehicle violation in which he was involved. On February 12, 1981, at approximately 10:00 p. m., New Castle County Police Officer Kenneth Conrad was cruising on Moores Lane near Castle Hills School, an area which had recently been the. subject of a rash of burglaries, when he observed a 1971 International Truck. The van was the only vehicle parked on the street directly across from the school and Officer Conrad immediately noticed that the license plate consisted solely of six digits and did not bear the commercial (C) or Pleasure/Commercial (PC) designation normally required for station wagons, vans and trucks. This aroused the officer’s suspicion and he parked his patrol car and ran a computer check on the tags. Motor vehicle records indicated that the license plate on the van had been issued for a Ford registered to John Doyle, Jr., of 40 Commonwealth Blvd., and not for an International Truck. Officer Conrad then visually observed the serial number on the van and after running this number through the computer discovered that the van itself was registered to a Mr. Hess of 108 Crawford Street, Middletown.
 

 Without leaving his post by the van, Officer Conrad arranged to have Hess contacted by telephone. Eventually, another patrolman contacted Hess’ residence in Middle-town and spoke with Hess’ wife who advised the officer that she and her husband were separated, but that as far as she knew, Hess still owned the van. A policeman then attempted to call Doyle at 40 Commonwealth Blvd., but was advised by the telephone operator that the phone had been disconnected. This information was conveyed to Officer Conrad.
 

 Officer Conrad then returned to the van and without entering the vehicle noticed a license plate on the floor of the vehicle which bore the same tag number issued to Hess for the International Truck. At this point, believing that the van may have been stolen or involved in some other illegal activity, Officer Conrad entered the vehicle, confiscated the plates lying on the floor and conducted a limited search of the glove compartment, ostensibly to locate the vehicle registration or other additional information which would assist him in reaching the rightful owner. He then contacted his Sergeant by radio who instructed him to have the vehicle towed because of the fictitious license plate.
 

 The following day, the police managed to contact Doyle and advised him that the van had been towed. Apparently, Doyle had purchased the van from Hess a few days before it was parked on Moores Lane and had simply removed his own tags from his
 
 *1347
 
 Ford and placed them on the recently purchased vehicle. As a result, Doyle received a summons and was arraigned on a charge of fictitious tags. Doyle then apparently elected to remove the case to the Court of Common Pleas for a hearing on probable cause. At the time appointed for the hearing, however, Officer Conrad failed to appear because he had not been notified of the proceeding by the prosecuting attorney. The Court of Common Pleas refused to grant the state a continuance and the matter was nolle prossed.
 

 In his amended complaint, Doyle argues that Officer Conrad lacked probable cause to enter and search his vehicle and to have it towed from Moores Lane. He seeks compensatory damages in the amount of $1,669.50, including reimbursement of his towing charges, storage fees and those attorney’s fees apparently incurred in the proceeding in the Court of Common Pleas, as well as costs incident to the prosecution of this § 1983 action. Doyle further seeks an award of punitive damages and requests the Court to enjoin Officer Conrad “from any further harassment involving this case and any further damages which might be caused by employees of the police department at this time.” (D.I. 17.)
 

 In response, Officer Conrad contends that he had probable cause to believe that the International Truck was stolen and under well established Supreme Court precedent, he was authorized both to search the van and to take the vehicle into custody. Moreover, under 11
 
 Del.C.
 
 § 2322, any vehicle “used in, or in connection with the commission of any felony” may be seized by a police officer having knowledge of such use. This statutory provision, defendant argues, provides additional independent grounds for the propriety of his actions.
 

 Generally, the probable cause requirement embodied in the Fourth Amendment is satisfied if under all the facts and circumstances, a reasonably prudent person would believe that evidence of a crime could be found at the location to be searched.
 
 Brinegar v. United States,
 
 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1310-11, 93 L.Ed. 1879 (1949). Although more than bare suspicion is required, only a probability and not a prima facie showing of criminal conduct need be demonstrated.
 
 Id.
 
 at 175, 69 S.Ct. at 1310;
 
 United States v. Martinez,
 
 588 F.2d 1227, 1234 (C.A.9, 1978);
 
 United States v. Scott,
 
 555 F.2d 522, 527 (C.A.5),
 
 cert. denied sub nom. Ogletree v. United States,
 
 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977);
 
 United States v. Trott,
 
 421 F.Supp. 550,553 (D.Del.1976). By striking this balance, the rule of probable cause represents a compromise between two competing interests — the right of citizens to be free from rash and unreasonable invasions of privacy and the need for enforcement agents to possess some unhampered discretion in investigating criminal activity for the protection of the community.
 
 Brinegar v. United States, supra,
 
 338 U.S. at 176, 69 S.Ct. at 1311.
 

 The Court agrees that, within this framework, probable cause existed for the search and subsequent seizure of Doyle’s van. The van was parked in an area which had been the site of frequent burglaries. The license plate attached to the vehicle was not the proper plate issued by the Motor Vehicle Department and the correct plates were discovered on the floor of the van. The former owner’s wife, Mrs. Hess, advised police that to her knowledge Mr. Hess still owned the van. Efforts to locate Doyle, moreover, were unsuccessful because his telephone had been disconnected. Under these circumstances, there was probable cause to believe that the van might be stolen and that a search of the vehicle would produce evidence pertaining to its theft.
 
 Accord United States v. Matthews,
 
 615 F.2d 1279, 1287 (C.A.10, 1980).
 

 Although a finding of probable cause is a necessary prerequisite to any search, that assessment is only half the battle confronting the defendant in this case. The Fourth Amendment protects the privacy and security of individuals by barring unreasonable searches and seizures. This requirement in turn has been interpreted to encompass two elements: (1) a
 
 *1348
 
 showing of probable cause;
 
 and
 
 (2) a search warrant issued on such a showing by a detached and neutral magistrate.
 
 Arkansas v. Sanders,
 
 442 U.S.. 753, 758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979). By vesting the probable cause determination in an impartial magistrate instead of in the “officer engaged in the often competitive enterprise of ferreting out crime,”
 
 Johnson v. United States,
 
 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), the amendment minimizes the risk of unreasonable assertions of authority.
 
 Arkansas v. Sanders, supra,
 
 442 U.S. at 759, 99 S.Ct. at 2591. Accordingly, the Supreme Court has consistently held that searches conducted without prior approval of a magistrate, no matter how facially reasonable they appear, are “per se unreasonable” and violate the Fourth Amendment.
 
 See e.g. Robbins v. California,
 
 - U.S. -, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981);
 
 Colorado v. Bannister,
 
 449 U.S. 1, 2-3,101 S.Ct. 42, 43, 66 L.Ed.2d 1 (1980);
 
 Coolidge v. New Hampshire,
 
 403 U.S. 443, 454-55, 91 S.Ct. 2022, 2031-32, 29 L.Ed.2d 564 (1971);
 
 Katz v. United States,
 
 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).
 

 Like any judicial interpretation, however, exceptions to the warrant requirement have been created where “it was concluded that the public interest required some flexibility in the general rule.”
 
 Arkansas v. Sanders, supra,
 
 442 U.S. at 759, 99 S.Ct. at 2591. These exceptions have been “jealously and carefully drawn” and there must be a showing by those claiming the exemption that exigent circumstances made the procurement of a warrant impracticable.
 
 Coolidge v. New Hampshire, supra,
 
 403 U.S. at 455, 91 S.Ct. at 2032. One such exception, claimed by Officer Conrad in this case, is the so-called “automobile exception,” which has been the focus of seemingly endless judicial attention with often incompatible or contradictory results.
 
 [2]
 

 In a long line of decisions originating with
 
 Carroll v. United States,
 
 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court has held that a search warrant is unnecessary “where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted and the car’s contents may never be found again if a warrant must be obtained.”
 
 Chambers v. Maroney,
 
 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970). A recognition of several distinguishing factors contributed to the evolution of the “automobile exception” in these cases. First, the circumstances that furnish probable cause to search a particular vehicle most often are unforeseeable and arise suddenly and unexpectedly. Second, the opportunity to search is often a brief one since the vehicle can easily be moved out of the locality and the alerted occupants may remove relevant evidence from its interior. Finally, where an automobile is stopped on a public road, no practical alternative exists to a warrantless search. For purposes of the Fourth Amendment, there is little constitutional significance between an immediate warrantless search of the vehicle and a seizure of the vehicle until a warrant can be obtained; the immobilization of the automobile for an indefinite period, while approval of a magistrate is sought, is no less an intrusion deserving of constitutional, protection than an on-the-spot search.
 
 Chambers v. Maroney, supra,
 
 399 U.S. at 50-51, 90 S.Ct. at 1980-81.
 

 Although the need to act quickly without the encumbrance of obtaining a warrant appears compelling where an automobile is stopped on the highway, the same cannot be said for a search involving an unoccupied parked vehicle, and this situation has produced uneven results in the Supreme Court.
 
 *1349
 
 In
 
 Coolidge v. New Hampshire, supra,
 
 a plurality of the Court invalidated the warrantless search and seizure of an unoccupied car parked on private property and strongly indicated that the exigent circumstances requirement could be met only in a
 
 Carroll
 
 type situation, where the vehicle is likely to be moved or the suspected evidence otherwise lost. 403 U.S. at 460-62, 45 S.Ct. at 2034-35. Three years later, however, in another plurality opinion, the Court concluded that the impoundment of an unoccupied car from a public parking lot was constitutionally permissible, even though the owner was in custody and there was no reasonable likelihood that the automobile could be moved out of the grasp of the police.
 
 Cardwell v.
 
 Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). In distinguishing this case from
 
 Coolidge,
 
 the plurality chose to emphasize the fact that the
 
 Coolidge
 
 seizure required an entry onto private property, whereas in
 
 Cardwell
 
 the automobile was seized from a public place where access was not meaningfully restricted.
 
 Id.
 
 417 U.S. at 593, 94 S.Ct. at 2471. Moreover, the Court refused to attach any legal significance to the fact that the car was seized from a public parking lot rather than being stopped on a highway, and noted, without extended comment, that the same “considerations of exigency, immobilization on the spot and posting a guard” while the warrant was secured made the delay impractical in both situations.
 
 Id.
 
 at 594-95, 94 S.Ct. at 2471-72. Finally, the Court introduced a new element into the equation governing the propriety of warrantless automobile searches and seizures— the notion that there is a diminished expectation of privacy in an automobile because its function is transportation, it does not serve as a residence or a repository of one’s personal effects, and it travels on public thoroughfares where its occupants cannot avoid public scrutiny.
 
 Id.
 
 at 590, 94 S.Ct. at 2469. Apparently, the “lesser expectation of privacy” attached to automobiles implicates a corresponding diminution in the showing of exigent circumstances necessary to validate a warrantless vehicle search or seizure.
 

 Although the Supreme Court has not at this writing eliminated the requirement of a warrant altogether in automobile searches and still pays homage to the necessity of demonstrating exigent circumstances,
 
 see South Dakota v. Opperman,
 
 428 U.S. 364, 382, 96 S.Ct. 3092, 3103, 49 L.Ed.2d 1000 (1976) (Powell, J., concurring);
 
 United States v. Matthews,
 
 615 F.2d 1279, 1286 (C.A.10, 1980);
 
 United States
 
 v.
 
 Robinson,
 
 533 F.2d 578, 581 (1976),
 
 Coolidge
 
 apparently represented the high water mark for the warrant requirement. The mobility of automobiles in particular situations remains an important factor in justifying a warrant-less search, but, in addition to
 
 Cardwell,
 
 the Court has increasingly sustained warrant-less searches of vehicles in instances where the possibility of removal of the vehicle or destruction of evidence contained within it was remote, if not nonexistent.
 
 United States v. Chadwick,
 
 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977);
 
 Cady v. Dombroski,
 
 413 U.S. 433, 441-43, 93 S.Ct. 2523, 2528-29, 37 L.Ed.2d 706 (1973);
 
 see South Dakota v. Opperman, supra; Texas v. White,
 
 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). Although none of these decisions addressed the situation presented by the Doyle case, involving an on-the-scene search of an unoccupied, parked vehicle, the increasing tolerance with which warrantless automobile searches have been viewed has not gone unnoticed by the Courts of Appeals. At least five circuits, including the United States Court of Appeals for the Third Circuit, have held searches and seizures of unoccupied, parked vehicles valid in circumstances which posed little or no risk that the car or its contents would be removed while a warrant was obtained.
 
 See United States v. Matthews,
 
 615 F.2d 1279 (C.A.10, 1980);
 
 United States v. Newbourn,
 
 600 F.2d 452 (C.A.4, 1979);
 
 United States v. Milhollan,
 
 599 F.2d 518 (C.A.3),
 
 cert. denied,
 
 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979);
 
 United States v. Robinson,
 
 533 F.2d 578 (C.A.D.C.1976);
 
 Haefeli
 
 v.
 
 Chernoff,
 
 526 F.2d 1314 (C.A.1, 1975).
 

 In
 
 United States v. Milhollan, supra,
 
 the defendant attempted to cash fraudulent
 
 *1350
 
 money orders in a bank when a suspicious teller alerted police. The defendant ran from the bank in the general direction of a public parking lot a few blocks away, but was apprehended after a brief chase. A search of the defendant at the police station revealed a set of car keys with a dealer’s tag marked “Gold Capri.” Police then returned to the public parking lot, located the Capri and drove it to the police station, where a search was conducted. The district court denied the defendant’s motion to suppress all evidence obtained from the warrantless search and seizure of the car, and, over the vigorous dissent of Judge Gibbons, the Third Circuit affirmed. 599 F.2d at 525.
 

 The court held that the police may conduct a warrantless search of an automobile whenever two factors are present: (1) there is probable cause to believe that the automobile contains articles subject to seizure, including evidence of a crime; and (2) the justification for the search arises suddenly and unexpectedly.
 
 Id.
 
 at 526. After concluding that probable cause existed to search the vehicle, the court observed:
 

 Nor can [defendant] argue that this probable cause did not arise suddenly and unexpectedly. . .. [E]vents surrounding the arrest itself triggered the suspicion that the automobile contained evidence.
 
 Coolidge v. New Hampshire,
 
 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), where the police knew for some time about the role of the automobile in the crime is distinguishable... .
 
 Coolidge
 
 does not control “where the occasion to search the vehicle arises suddenly.” . . . When such probable cause suddenly crops up, the police need not freeze the situation while they secure a search warrant for the automobile. They may search the car immediately or seize it and search it later. . . . Applying these standards we conclude that the search of [defendant’s] automobile was legitimate.
 

 Id.
 
 Thus, even though the defendant was safely in police custody at the time the automobile was located and searched, the police had possession of the car keys, and there was no allegation of any confederates which might have access to the car,
 
 id.
 
 at 533 (Gibbons, J., dissenting), the Third Circuit found the circumstances giving rise to the search sufficiently “exigent” to dispense with the requirement of a warrant.
 

 Based on a review of the foregoing authorities, it is difficult for this Court to envision under what circumstances, if any, appellate courts would require a warrant for the search of an unoccupied automobile parked on a public thoroughfare. As the courts have given a broader reading to the exigent circumstances requirement, the Court suspects that the word “automobile” may well have become the “talisman in whose presence the Fourth Amendment fades away and disappears.”
 
 Coolidge v. New Hampshire, supra,
 
 402 U.S. at 461-62, 91 S.Ct. at 2035-36. Nonetheless, if the police in
 
 Milhollan
 
 were not required to secure a warrant, a
 
 fortiori
 
 Officer Conrad in this case was not required to “freeze the situation” while approval of a magistrate was sought to search Doyle’s vehicle. Here, not only did the probable cause arise suddenly and unexpectedly, but the van was positioned in a public place where access was not meaningfully restricted and Officer Conrad was aware that the suspected thief was still at large and might return at any moment to claim his newly acquired vehicle. In these circumstances the limited and discrete search of the van could permissibly be made without the requirement of a warrant. Moreover, because probable cause and exigent circumstances existed for the on-the-spot search of the vehicle, Officer Conrad was also authorized to take the vehicle into custody without offending the Fourth Amendment.
 

 III.
 
 Conclusion
 

 For the reasons stated in this opinion, judgment will be entered in favor of the defendants in this case and against the plaintiff.
 

 [1]
 

 . In plaintiff’s brief filed in response to defendants’ motion for summary judgment, he claims that Salter and Wilson refused to refund the $19.50 without his social security number because of racial prejudice. (D.I. 29 at 10.) Each defendant testified, however, that she had never met Doyle prior to the trial of this case and it is thus uncertain whether either woman knew that Doyle was black. Moreover, there was absolutely no evidence of racial animus on the part of the defendants introduced at the trial.
 

 [2]
 

 . For purposes of this discussion, the “automobile exception” refers solely to searches involving the physical parts of the vehicle itself, i.e., the exterior, glove compartment, trunk or passenger compartment, and not to searches of closed containers or other sealed items found within the vehicle. Searches of these latter objects raise constitutional issues separate and distinct from those normally pertinent to the “automobile exception” and implicated in this case. See
 
 e.g. Robbins v.
 
 California,-U.S. -, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981);
 
 Arkansas v. Sanders,
 
 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).