**[This opinion has been published in *Ohio Official Reports* at 70 Ohio St.3d 605.]**

THE STATE EX REL. BEACON JOURNAL PUBLISHING COMPANY ET AL.,

APPELLEES, *v*. CITY OF AKRON ET AL., APPELLANTS.

[Cite as *State ex rel. Beacon Journal Publishing Co. v. Akron*, 1994-Ohio-6.]

*Public records—R.C. 149.43 does not mandate that a city disclose the Social Security numbers of its employees upon demand.*

(No. 93-2012—Submitted May 10, 1994—Decided October 26, 1994.)

APPEAL from the Court of Appeals for Summit County, No. 15872.

_____

{¶ 1} Appellee Beacon Journal Publishing Company ("ABJ") publishes the newspaper known as The Akron Beacon Journal. Appellee Robert Paynter is a project editor and employee of ABJ. Appellant Linda Sowa was the finance director of the appellant city of Akron.

{¶ 2} ABJ and Paynter asked the city and Sowa to provide them with computer tape records of the city's year-end employee master files for the years 1990 and 1991 pursuant to R.C. 149.43, Ohio's public records statute. These payroll files contain various information including employees' names, addresses, telephone numbers, Social Security numbers ("SSNs"), birth dates, education, employment status and positions, pay rates, service ratings, annual and sick leave information, overtime hours and pay, and year-to-date employee earnings. The city has approximately two thousand five hundred employees. Thirteen employees have access to the computerized employee master payroll file.

{¶ 3} Sowa and the city provided copies of these records with the SSNs deleted.

{¶ 4} ABJ and Paynter then requested a copy of the same records complete with SSNs.

{¶ 5} Sowa and the city refused to disclose the employees' SSNs.

**{¶ 6}** In August 1992, ABJ and Paynter filed a complaint in mandamus in the Court of Appeals for Summit County against Sowa and Akron, alleging that, pursuant to R.C. 149.43, they were entitled to obtain the payroll records complete with SSNs. Sowa and the city denied the existence of this obligation, alleging that SSNs are not "records" as that term is defined in R.C. 149.011(G), and that disclosure of employees' SSNs would violate the employees' right to privacy.

**{¶ 7}** The court of appeals granted the petition for mandamus. The appellate court found that SSNs are public records for purposes of R.C. 149.43, and that their disclosure would not violate the right to privacy.

**{¶ 8}** This cause is now before this court upon an appeal as of right.

—————————————

*Roetzel & Andress, Ronald S. Kopp* and *Amie L. Bruggeman*, for appellees.

*Max Rothal*, Director of Law, and *Deborah M. Forfia*, Assistant Director of Law, for appellants.

*Paul R.Q. Wolfson* and *David C. Vladeck*, urging reversal for *amicus curiae*, Public Citizen Litigation Group.

*Marc Rotenberg* and *David L. Sobel*, urging reversal for *amicus curiae*, Computer Professionals for Social Responsibility.

—————————————

**PFEIFER, J.**

**{¶ 9}** We are asked to determine whether the city is obligated to provide the ABJ with the SSNs of approximately two thousand five hundred city employees pursuant to Ohio's public records statute. For the following reasons, we find that disclosure of this information is not required.

I

{¶ 10} The city and Sowa contend that they are not obligated to provide the SSNs because they are not "records" for purposes of the Public Records Act. We disagree.

{¶ 11} When "information in question is not a record, it is not a public record subject to disclosure under R.C. 149.43." *State ex rel. Fant v. Mengel* (1992), 62 Ohio St.3d 455, 584 N.E.2d 664, 665. R.C. 149.011 broadly defines "records." This definition is to be given an expansive rather than a restrictive construction. *State ex rel. Cincinnati Post v. Schweikert* (1988), 38 Ohio St.3d 170, 527 N.E.2d 1230. R.C. 149.011 provides the following:

"As used in this chapter:

" * * *

"(G) 'Records' includes any document, device, or item, regardless of physical form or characteristic, created or received by or coming under the jurisdiction of any public office of the state or its political subdivisions, which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office."

{¶ 12} The city has stipulated that its computerized year-end employee master payroll files contain the SSNs of all of its employees. The city uses the SSNs as taxpayer identification numbers in these files. This use of the SSN by the city leads us to conclude that it is a "device * * * received by * * * political subdivisions, which serves to document organization, functions, [and] operations * * * of the office." Thus, the Social Security numbers of the city's employees are "records" for the purposes of the Public Records Act.

II

{¶ 13} We must next determine whether SSNs, while being "records," are also "public records" for purposes of the Public Records Act. For the following reasons, we conclude that they are not public records.

**{¶ 14}** To compel the city to disclose the SSNs of its employees, the ABJ must prove that they are public records. R.C. 149.43(A) defines "public records," as follows:

"As used in this section:

"(1) 'Public record' means any record that is kept by any public office, including, but not limited to, state, county, city, village, township, and school district units, except medical records, records pertaining to adoption, probation, and parole proceedings, records pertaining to actions under section 2151.85 of the Revised Code and to appeals of actions arising under that section, records listed in division (A) of section 3107.45 of the Revised Code, trial preparation records, confidential law enforcement investigatory records, and records the release of which is prohibited by state or federal law. * * *"

**{¶ 15}** Records that are "public records" as defined in R.C. 149.43(A) must be disclosed pursuant to R.C. 149.43(B).[1]

**{¶ 16}** The city and *amici* contend that disclosure of the SSNs would violate the right to privacy of city employees and, thus, is not permissible. R.C. 149.43(A) expressly excludes the release of records which would violate state or federal law. Because we find that the disclosure of the SSNs would violate the federal constitutional right to privacy, we find them to be excluded from mandatory disclosure.[2]

---

1. R.C. 149.43(B) provides:

"All public records shall be promptly prepared and made available for inspection to any person at all reasonable times during regular business hours. Upon request, a person responsible for public records shall make copies available at cost, within a reasonable period of time. In order to facilitate broader access to public records, governmental units shall maintain public records in a manner that they can be made available for inspection in accordance with this division."

2. Appellants and *amici* do not contend that disclosure of the city employees' SSNs would violate a separate state constitutional right to privacy. Thus, that issue is not discussed.

{¶ 17} "The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." (Footnotes omitted.) *Whalen v. Roe* (1977), 429 U.S. 589, 598-600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64, 73. The first interest is relevant to the matter before us.

{¶ 18} The right to avoid disclosure of personal matters is so broad in scope that it applies to the most public of our public figures. Even the President of the United States possesses this right. *Nixon v. Admr. of Gen. Serv.* (1977), 433 U.S. 425, 457, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867, 900.

{¶ 19} In *Nixon*, the United States Supreme Court discussed the right to have personal matters free from disclosure to the public. President Nixon sought to prevent the Administrator of the General Services Administration from taking custody of an estimated forty-two million pages of documents and eight hundred eighty tape recordings from the Nixon presidency, and promulgating rules for eventual public access. Nixon argued, among other things, that the Presidential Recordings and Materials Preservation Act ("PRMPA"), which prescribes the process by which these documents were to be disclosed, violated Nixon's right to privacy. Pursuant to the PRMPA, government archivists were entrusted with responsibility of preventing confidential and personal matters from being disclosed.

{¶ 20} The *Nixon* court found that "appellant [Nixon] has a legitimate expectation of privacy in his personal communications." *Id.,* 433 U.S. at 465, 97 S.Ct. at 2801, 53 L.Ed.2d at 905. The court concluded, however, that this right to privacy was not absolute. Instead, the court found that when an individual has an interest in avoiding disclosure, that interest must be weighed with the government's interest in disclosing the information. "[T]he constitutionality of the Act must be viewed in the context of the limited intrusion of the screening process, of appellant's status as a public figure, of his lack of any expectation of privacy in the

overwhelming majority of the materials, of the important public interest in preservation of the materials, and of the virtual impossibility of segregating the small quantity of private materials without comprehensive screening. When this is combined with the Act's sensitivity to appellant's legitimate privacy interests * * *, the unblemished record of the archivists for discretion, and the likelihood that the regulations to be promulgated by the Administrator will further moot appellant's fears that his materials will be reviewed by 'a host of persons,' * * * we are compelled to agree with the District Court that appellant's privacy claim is without merit." *Id.*

{¶ 21} Thus, according to the *Nixon* case, there is a federal right to privacy which protects against governmental disclosure of the private details of one's life. *Nixon,* although not dispositive of the case before us, sets forth the parameters of the right to privacy that we apply to the present case. We must use an analysis similar to that used in *Nixon* to determine whether the right to privacy of city employees is invaded when the city reveals their SSNs to all inquirers. We must determine whether the city employees have a legitimate expectation of privacy in their SSNs and then whether their privacy interests outweigh those interests benefited by disclosure of the numbers. *Slayton v. Willingham* (CA.10, 1984), 726 F.2d 631, 635.

A

Expectation of Privacy

{¶ 22} Due to the federal legislative scheme involving the use of SSNs, city employees have a legitimate expectation of privacy in their SSNs. Uncodified Section 7 of the Privacy Act of 1974 provides the following:

"(a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

" * * *

"(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it." Section 552a note (Disclosure of Social Security Number), Title 5, U.S.Code, Pub.L. No. 93-579, Section 7, 88 Stat. 1896, 1909.

{¶ 23} The purpose of the Privacy Act of 1974 was "to curtail the expanding use of social security numbers by federal and local agencies and, by so doing, to eliminate the threat to individual privacy and confidentiality of information posed by common numerical identifiers." *Doyle v. Wilson* (D.Del.1982), 529 F.Supp. 1343, 1348.

{¶ 24} Congress when enacting the Privacy Act of 1974 was codifying the societal perception that SSNs should not to be available to all. This legislative scheme is sufficient to create an expectation of privacy in the minds of city employees concerning the use and disclosure of their SSNs.

B

Weighing Interests Benefited by Disclosure Against Privacy Interests

{¶ 25} Having held that employees of the city have a reasonable expectation of privacy regarding the disclosure of their Social Security numbers, we must weigh these privacy interests against those favoring disclosure.

{¶ 26} The United States Court of Appeals for the Fourth Circuit reviewed a case similar to this one in *Greidinger v. Davis* (C.A.4, 1993), 988 F.2d 1344. In *Greidinger,* the plaintiff challenged Virginia voting laws that required citizens to provide their SSNs when registering to vote. These SSNs were available to anyone who purchased voter registration lists. The state of Virginia claimed that the SSNs were necessary to avoid voter fraud. The court of appeals held that Virginia's interest in internal use of SSNs did not justify disclosure and that other data such

as voter registration numbers or addresses would provide the state with enough information to distinguish voters with the same name.

**{¶ 27}** The appellate court held that the disclosure of this other information was less intrusive than the disclosure of SSNs. The *Greidinger* court listed the potential jeopardy that voters would be placed in if their Social Security numbers were recorded and then unconditionally released:

"[A]rmed with one's SSN, an unscrupulous individual could obtain a person's welfare benefits or Social Security benefits, order new checks at a new address on that person's checking account, obtain credit cards, or even obtain the person's paycheck. * * * Succinctly stated, the harm that can be inflicted from the disclosure of an SSN to an unscrupulous individual is alarming and potentially financially ruinous." *Id*. at 1353-1354.

**{¶ 28}** After discussing the potential evils created by the release of voters' SSNs, the Greidinger court stated:

"Virginia's voter registration form requires a registrant to supply, among other things, his name, address, SSN, age, place of birth, and county of previous registration. Virginia's interest in preventing voter fraud and voter participation could easily be met without the disclosure of the SSN and the attendant possibility of a serious invasion of privacy that would result from that disclosure. * * * Most assuredly, an address or date of birth would sufficiently distinguish among voters that shared a common name." *Id.* at 1354-1355.

**{¶ 29}** The case before this court requires analysis similar to that used by the *Greidinger* court. The public's interest in obtaining city employees' SSNs must be weighed against the harm caused by the invasion of employees' privacy resulting from the release of the SSNs.

**{¶ 30}** It is fundamental tenet of democracy that the people, the press, and the media be fully informed about the processes of their government. As John Adams noted, "[l]iberty cannot be preserved without a general knowledge among

the people, who have a right * * * and a desire to know; but besides this, they have a right, an indisputable, unalienable, indefeasible, divine right to that most dreaded and envied kind of knowledge, I mean of the characters and conduct of their rulers." John Adams, A Dissertation on the Canon and Feudal Law (1765). However, this right is by no means boundless or unconditional. See *Nixon.*

{¶ 31} The city's refusal to release its employees' SSNs does not significantly interfere with the public's right to monitor governmental conduct. The numbers by themselves reveal little information about the city's employees. The city provided appellees with enormous amounts of other information about each city employee; only the SSNs numbers were deleted. Employees' addresses, telephone numbers, salaries, level of education, and birth dates, among other things, were all provided. The data supplied by the city provides far more enlightening information about the composition of the city's workforce than would SSNs.

{¶ 32} While the release of all city employees' SSNs would provide inquirers with little useful information about the organization of their government, the release of the numbers could allow an inquirer to discover the intimate, personal details of each city employee's life, which are completely irrelevant to the operations of government. As the *Greidinger* court warned, a person's SSN is a device which can quickly be used by the unscrupulous to acquire a tremendous amount of information about a person.

{¶ 33} In this case, James E. Young, an employee of the city, testified that he objected to the city's release of his SSN because of the harm previously caused by the unwarranted release of his SSN. Young testified that, in 1989, he and a friend were attempting to purchase a rental property. Young was informed that he would be denied credit partly because of delinquent accounts with retail credit institutions.

{¶ 34} Young was notified by the ex-wife of another James E. Young ("Young 2"), that Young 2 had obtained Young's SSN when Young 2 requested his own transcript from the University of Akron. The university erroneously sent

Young 2 the transcript of Young, complete with Young's SSN. Young 2, using the improper SSN, opened accounts with Firestone, Texaco, Associate Finance and a department store in Richmond, Virginia. Apparently, Young 2 had used these accounts and was delinquent in paying them. In order to rectify his credit record, Young had to pay nearly $800 in attorney fees. The plight of Young illustrates the ability of a pretender using an SSN to assume another's identity. This is perhaps the ultimate invasion of one's privacy.

{¶ 35} During recent Congressional hearings, journalist Jeffrey Rothfeder testified before the House Subcommittee on Social Security that, during a journalistic investigation, he was able to obtain highly confidential information about then Vice-President Dan Quayle with the use of Quayle's SSN. Rothfeder obtained Quayle's private Virginia address and the Vice President's unlisted phone number. Through this exercise, Rothfeder "wanted to show that with privacy at a premium and data banks proliferating even the Vice President of the United States is easy pickings for somebody with prying eyes." Use of Social Security Number as a National Identifier, Hearing Before the Subcommittee on Social Security of the Committee on Ways and Means, 102d Congress, 1st Session, Serial 102-11 (1991) 75.

{¶ 36} Thanks to the abundance of data bases in the private sector that include the SSNs of persons listed in their files, an intruder using an SSN can quietly discover the intimate details of a victim's personal life without the victim ever knowing of the intrusion.

{¶ 37} We find today that the high potential for fraud and victimization caused by the unchecked release of city employee SSNs outweighs the minimal information about governmental processes gained through the release of the SSNs. Our holding is not intended to interfere with meritorious investigations conducted by the press, but instead is intended to preserve one of the fundamental principles of American constitutional law—ours is a government of limited power. We

10

conclude that the United States Constitution forbids disclosure under the circumstances of this case. Therefore, reconciling federal constitutional law with Ohio's Public Records Act, we conclude that R.C. 149.43 does not mandate that the city of Akron disclose the SSNs of all of its employees upon demand.

{¶ 38} The judgment of the court of appeals is reversed.

*Judgment reversed.*

MOYER, C.J., and A. WILLIAM SWEENEY and SHAW, JJ., concur.

DOUGLAS, RESNICK, and FRANCIS E. SWEENEY, SR., JJ., dissent.

STEPHEN R. SHAW, J., of the Third Appellate District, sitting for WRIGHT, J.

_____

**DOUGLAS, J., dissenting.**

{¶ 39} Jonathan Swift (1667-1745), an Eighteenth Century English satirist, poet and Anglican clergyman, once said: "Invention is the talent of youth, as judgment is of age." International Dictionary of Thoughts (1969) 405. Today, by inventing a social security number exception to the Public Records Law, R.C. 149.43, a majority of this court has glorified the talent of youth—invention—and has scorned the talent of age—judgment. Those who would decry judicial activism take heed. Today's decision is judicial activism at its best. Being troubled that a person's social security number might become the subject of public scrutiny (a proposition to which I am not unsympathetic), the majority fashions yet another exception to R.C. 149.43 and concludes that the disclosure of the city of Akron employees' social security numbers to appellees would violate the employees' constitutional right to privacy. Because there is *no* legal authority for such a holding and, indeed, because the law is actually to the contrary, I must respectfully dissent.

{¶ 40} In support of its novel proposition, the majority cites no section of the Ohio Revised Code. There is good reason for this. There is none. The majority does not cite any provision of the Ohio Constitution supporting its position. There

is good reason for this. There is none. The majority does not cite any federal statute in support of its holding. Again, there is good reason. There is none. No provision of the United States Constitution is cited in support. Why? There is none. No case law either federal or state of Ohio is given as authority. Why? Same answer—there is none.

**{¶ 41}** Simply put, the majority has concocted an exception to R.C. 149.43 that does not, in law, exist. In doing so, the majority creates a corresponding right where none presently exists under either Ohio or federal law. In the best tradition of Justice William O. Douglas's discovery of a "penumbra," in *Griswold v. Connecticut* (1965), 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 2d 510, today the majority fabricates a social security penumbra from whole cloth.

**{¶ 42}** In support of its position, the majority cites *Nixon v. Admr. of Gen. Serv.* (1977), 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867. The majority suggests that *Nixon* is persuasive authority for the majority's holding but then, almost immediately, the majority states that *Nixon* is " * * * not dispositive of the case before us * * *." The majority does not tell us how *Nixon* is "not dispositive." The reason for this may be that it is so obviously inapplicable.

**{¶ 43}** *Nixon* involved a complaint filed by the former President in the District Court of the District of Columbia, challenging the constitutionality of the Presidential Recordings and Materials Preservation Act ("Act"). The District Court held that the claims set forth by the former President lacked merit and, accordingly, dismissed the complaint. The United States Supreme Court affirmed the judgment of the district court, holding, among other things, that the Act was not an unconstitutional infringement on the former President's right of privacy. Importantly, the court noted that a "claim of invasion of his privacy cannot be considered in the abstract; rather, the claim must be considered in light of the specific provisions of the Act, and any intrusion must be weighed against the public

interest in subjecting the Presidential materials of appellant's administration to archival screening."  *Id.* at 458, 97 S.Ct. at 2797-2798, 53 L.Ed.2d at 900.

{¶ 44} From this "not dispositive" holding, the majority forms an abstract legal standard, stating that " * * * there is a federal right to privacy which protects against governmental disclosure of the private details of one's life." This statement by the majority, if derived from *Nixon*, is not just overbroad. It is just plain wrong! *Nixon* involved federal questions, federal legislation, and federal officials. The Supreme Court did conclude that the former president may have a legitimate expectation of privacy in some of his personal communications.  *Id.* at 465, 97 S.Ct. at 2801, 53 L.Ed.2d at 905.  However, the Supreme Court did *not* hold in *Nixon*, nor has it *ever* held or *even* implied, that an absolute federal right to privacy exists for all individuals under all circumstances.

{¶ 45} With the "not dispositive" *Nixon* case lending little or no solace or support for its position, the majority then turns for help to Section 7 of the Privacy Act of 1974 and concludes that the city employees have an expectation of privacy in their social security numbers under the Act. This Act provides in relevant part that:

"(a)(1) It shall be unlawful for any *Federal, State or local government agency* to deny to any individual any right, benefit, or privilege provided by law *because of such individual's refusal* to disclose his social security account number.
" * * *

"(b) Any *Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual* whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it." (Emphasis added.)  Section 552a note (Disclosure of Social Security Number), Title 5, U.S.Code, Pub.L. 93-579, Section 7, 88 Stat. 1896, 1909.

**{¶ 46}** The intent of the federal statute is clear. It is apparent, at least to me, that this statute has nothing to do with a request by a newspaper to obtain records from a municipality. First, the Privacy Act of 1974 applies *only* when an *entity requesting the information* is an instrument of the *federal government* or the *individual states.* *Doyle v. Wilson* (D.Del.1982), 529 F.Supp. 1343, 1348-1349; *Am. Fedn. of State, Cty. & Mun. Emp. v. Albany* (1986), 81 Ore.App. 231, 725 P.2d 381; and *Freeman v. Koerner Ford of Scranton, Inc.* (1987), 370 Pa.Super 150, 536 A.2d 340. Second, "[t]he apparent purpose of this section is to define the circumstances in which *a government* may require individuals to disclose their numbers, to allow individuals to make informed choices about whether to disclose their numbers in other circumstances and to provide protection for individuals who decide not to make voluntary disclosure. *Nothing in the act expressly prohibits the government from disclosing the numbers once they are in its possession.*" (Emphasis added.) *Am. Fedn. of State, Cty. & Mun. Emp., supra*, 81 Ore.App. at 234, 725 P.2d at 383.

**{¶ 47}** Obviously, the Privacy Act of 1974 does not support the holding of the majority, but even if it did, the Act only applies to instruments of the federal government or the individual states. The *Akron Beacon Journal* may be a government unto itself. What it assuredly is *not* is an instrument of government.

**{¶ 48}** Notwithstanding this, the majority closes Section A of Part II of the opinion with the remarkable statement that "[t]his legislative scheme is sufficient to create an expectation of privacy in the minds of city employees concerning the use and disclosures of their SSNs." Just because one believes or even asserts that one has an expectation of privacy in a particular circumstance does not make it so in law. Having concluded Section A of Part II of the opinion as set forth above, the majority then moves to Section B, which is titled "Weighing Interests Benefited by Disclosure Against Privacy Interests." The only citation of authority in Section B

14

is *Greidinger v. Davis* (C.A.4, 1993), 988 F.2d 1344. The majority's reliance on *Greidinger* is equally misplaced.

{¶ 49} In *Greidinger*, the court held that two Virginia statutes, which required disclosure of a voter registrant's social security number *as a condition to the right to vote,* created an impermissible burden on the exercise *of the fundamental right to vote.* In weighing this burden, the court considered Section 7 of the Privacy Act of 1974 (which, as we have seen, is not applicable here), and Exemption 6 of the federal Freedom of Information Act ("FOIA"), Section 552(b)(6), Title 5, U.S.Code. Section 552(b)(6) provides that certain personnel and medical files are not subject to disclosure if disclosure would "constitute a clearly unwarranted invasion of personal privacy." The protections afforded under the federal Privacy Act of 1974 and FOIA are a product of statute, not of federal common-law privacy rights. Further, our Ohio statute, R.C. 149.43, does not include an exemption from disclosure comparable to that found in Section 552(b)(6). In any event, Greidinger does not stand for the proposition, which was not even mentioned in the opinion, that a voter registrant has a constitutional right to privacy.

{¶ 50} Further, United States Supreme Court decisions which have discussed privacy protections for individuals do not support the majority's blanket conclusion that "the disclosure of the SSNs would violate the federal constitutional right to privacy." In *Doyle, supra*, the court, after examining various Supreme Court decisions and decisions from other courts, concluded that "the constitutional right to privacy embodies solely 'those personal rights that can be deemed fundamental or implicit in the concept of ordered liberty.' * * * The activities ordinarily embraced by this definition relate to the intimate facets of an individual's personal life, namely, marriage, procreation, contraception, family relationships, child rearing or education. * * * *The courts accordingly have held, and this Court concurs in that view, that mandatory disclosure of one's social security number*

*does not so threaten the sanctity of individual privacy as to require constitutional protection.*" (Citations omitted and emphasis added.) *Doyle, supra,* 529 F.Supp. at 1348. Indeed, *Doyle*, which the majority cites in support, actually undermines its position. Further, see, *e.g., Paul v. Davis* (1976), 424 U.S. 693, 712-713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405, 420-421.

{¶ 51} Finding no real support for its holding, the majority then moves on in Section B of the opinion and determines that "[h]aving held that employees of the city have a reasonable expectation of privacy regarding the disclosure of their Social Security numbers, *we* must weigh these privacy interests against those favoring disclosure." (Emphasis added.) This determination clearly misstates the law. In *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.* (1992), 65 Ohio St.3d 258, 266, 602 N.E.2d 1159-1164-1165, we held that: "*It is the role of the General Assembly to balance* the competing concerns of the public's right to know and individual citizens' right to keep private certain information that becomes part of the records of public offices. The General Assembly has done so, as shown by numerous statutory exceptions to R.C. 149.43(B), found in both the statute itself and in other parts of the Revised Code." (Emphasis added.)

{¶ 52} R.C. 149.43 requires that all public records be made available to *any* person. See State ex rel. Steckman v. Jackson (1994), 70 Ohio St.3d 420, 639 N.E.2d 83. Any exception to this rule must be found within the statute itself, which includes an exception for those "records the release of which is prohibited by state or federal law." R.C. 149.43(A)(1).

{¶ 53} As we have seen, there is no federally mandated exception to R.C. 149.43. In Ohio, the General Assembly *has* provided specific circumstances where disclosure of certain records is prohibited. Examples follow.

{¶ 54} R.C. 2505.073 deals with the right of a minor to appeal the dismissal, by a juvenile court, of her complaint to have an abortion without parental notification. R.C. 2505.073(B) provides that:

"All proceedings under division (A) of this section shall be conducted in a manner that will preserve the anonymity of the appellant on appeal. All papers and records that pertain to an appeal under this section *shall be kept confidential and are not public records* under section 149.43 of the Revised Code." (Emphasis added.)

{¶ 55} R.C. 3701.241 deals with duties of the Director of Health related to AIDS and HIV. R.C. 3701.241(A)(7) provides, in part, that:

"Information obtained or maintained under the partner notification system *is not a public record under section 149.43 of the Revised Code* and may be released only in accordance with division (C) of section 3701.243 of the Revised Code." (Emphasis added.)

{¶ 56} Specifically, with regard to a person's social security number, R.C. 1349.17 restricts the recording of credit card, telephone or social security numbers. Subject to certain exceptions found in R.C. 1349.17(B), R.C. 1349.17(A)(2) provides that:

"No person shall record or cause to be recorded either of the following:
" * * *

"(2) The telephone number or social security account number of the other party to a transaction, when payment is made by credit card charge agreement, check, bill of exchange, or other draft."

{¶ 57} R.C. 4501.15 also restricts disclosure of social security numbers. The first sentence of R.C. 4501.15 provides that:

"The department of public safety *shall not provide social security numbers* from its driver license and vehicle registration records to any person, except local, state, or federal governmental agencies." (Emphasis added.)

{¶ 58} Just as significantly, the second sentence of the section provides that:

"This section *does not preclude* the registrar from reporting a person's social security number if the number was provided in the request for information." (Emphasis added.)

{¶ 59} R.C. 742.41 involves, in part, access to records of the Police and Firemen's Disability and Pension Fund. R.C. 742.41 provides the following:

"(A) As used in this section:

" * * *

"(2) 'Personal history record' includes a member's * * * name, address, phone number, *social security number* * * * and any other information deemed confidential by the trustees of the fund.

"(B) * * * The records of the board shall be open for public inspection except for the following, which shall be excluded, except with the written authorization of the individual concerned:

"(1) The individual's personal history record[.]" (Emphasis added.) Thus, it is clear that if the General Assembly had chosen to make a social security number exception to R.C. 149.43, given R.C. 2505.073(B), 3701.241(A)(7), 1349.17(A)(2), 4501.15 and 742.41(A)(2) and (B)(1), it certainly knew how to do so. The simple fact is that there is *no* statute which prohibits the release of a city employee's social security number. Whatever our individual personal preference might be, that preference should not be permitted to invade the mandates of the law.

{¶ 60} In today's multifarious society, social security numbers have become an important means of identification. Our social security number in many instances has become our name. It is commonplace to be asked to reveal our number, both in the private sector and in contacts with the government. For example, the average citizen is asked to reveal his or her number on banking forms, to cash checks, to apply for loans or credit cards. Job application forms request social security numbers. College students' grades are often posted by social security number. Question No. 1 on the State of Ohio Employees Ohio Med Benefits Claim

Form is the social security number of the patient-claimant. Not until question No. 4 is the patient's name even asked. Blue Cross Blue Shield of Ohio Explanation of Benefits Form gives the claimant's social security number as "Your identification number." The claimant's name follows later on the form. The list is endless. We are even required to reveal our numbers when applying for a marriage license. R.C. 3101.05; see, also, R.C. 4513.361, which prohibits the giving of a false social security number to a law enforcement officer who is in the process of issuing a traffic ticket or complaint. Does the average citizen really have an expectation of privacy in his or her social security number as the majority seems to think? The law clearly answers that question in the negative.

**{¶ 61}** The fear (and I concede that it is a genuine concern) is that a person's social security number in the wrong hands can result in criminal conduct. This is true also, of course, of checks, credit cards and other instruments that are negotiable. While this is of concern, the answer is that criminal conduct should be punished by criminal sanctions. Some people drive while intoxicated, but we do not, because of this, prohibit everyone from driving. Some people shoplift, but we do not close all stores because that is so.

**{¶ 62}** Some members of the majority are fond of saying, when a particular issue is presented to the court for decision, that "the matter should be left to the legislature." Well, in this case, the matter has been left to the legislature and no exception to R.C. 149.43 for social security numbers has been enacted. Now the majority's answer is different. Where the legislature has not acted to create an exception, we had better do so! Let the judicial activism argument now be put to rest.

**{¶ 63}** In this case, a unanimous court of appeals, Judges Baird, Dickinson and Reece, in a well-reasoned opinion[3] held that a writ should be granted ordering the release of the requested social security numbers. In *State ex rel. Lippitt v. Kovacic* (1991), 70 Ohio App.3d 525, 591 N.E.2d 422, a unanimous court of appeals, Judges John V. Corrigan, Krupansky and Patton of the Court of Appeals for Cuyahoga County, held that records which contained social security numbers were public records and should be released upon proper request. In this case, we should follow—others have led.

**{¶ 64}** Because the majority's decision is based on personal predilections and not the law, I must respectfully dissent. I would affirm the judgment of the court of appeals granting relators' writ.

RESNICK and FRANCIS E. SWEENEY, SR., JJ., concur in the foregoing dissenting opinion.

––––––––––––––––––

3. I do not agree with the decision of the court of appeals to deny relators' attorney fees. See *State ex rel. Fox v. Cuyahoga Cty. Hosp. Sys.* (1988), 39 Ohio St.3d 108, 112-114, 529 N.E.2d 443, 447-448 (Douglas, J., concurring in part and dissenting in part).