**Rick J. SMITH, Plaintiff,**

v.

**CITY OF DAYTON, OHIO, Defendant.**

**No. C–3–98–359.**

United States District Court,
S.D. Ohio,
Western Division.

Sept. 7, 1999.

Barry S. Galen, Barry S. Galen Attorney at Law, Dayton, OH, for Rick J. Smith, plaintiff.

Patrick Joseph Bonfield, John J. Danish, City of Dayton Law Department, Dayton, OH, for Dayton City of, defendant.

**DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

MERZ, United States Magistrate Judge.

Plaintiff Rick J. Smith, a former police officer of Defendant City of Dayton, Ohio, brought this action for damages under 42 U.S.C. § 1983, claiming that the City violated his constitutional right to privacy and his rights under the Ohio Public Records Act when it released information from his personnel file to the Dayton Daily News on August 26, 1997.

The parties have unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c) and the case has been referred on that basis (Doc. # 7).

The case is before the Court on Defendant's renewed Motion for Summary Judgment (Doc. # 42), Plaintiff's Memorandum in Opposition (Doc. # 45), and the City's Reply (Doc. # 46). On the City's previous Motion to Dismiss or for Summary Judgment, the Court upheld the City's claim of immunity on the supplemental Ohio Public Records Act claim. Thus the sole remaining claim is for violation of the constitutional right of privacy.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989). If, after sufficient time for discovery, the opposing party is unable to ·demonstrate that he or she can do so

under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.*

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties. The discovery record presented on the instant Motion is quite sparse, consisting only of the Affidavit of Janice Brooks and the Depositions of Plaintiff and Mr. David Rado, and very limited citations have been made in the parties' motion papers to that record.

It is critical that the present Motion for Summary Judgment is made after the conclusion of discovery in the case; in accordance with the Scheduling Order as amended, discovery was cut off as of June 30, 1999 (See Doc. # 30) [1].

The material facts as established by the discovery record are as follows:

In the course of his duties as a Dayton Police Officer, Plaintiff was compelled to shoot a person on August 22, 1997. Apparently the man was essentially committing suicide by deliberately attacking a police officer in such a way that only a lethal response would have prevented serious harm to the officer; the decedent had attempted suicide on two other earlier oc-

---

1. Plaintiff's Memorandum in Opposition notes the Court's prior holding that Plaintiff must be able to show "he could establish a prima facie case after discovery is complete," but then comments "Thus Plaintiff asserts that Defendant's present motion for summary judgment is still not ripe for decision." However, Defendant's present motion was filed after the discovery cut-off and Plaintiff has not sought to conduct any additional discovery.

casions on the same day. The shooting quickly became a matter of public knowledge. Officer Smith was apparently dispatched to the location where the incident occurred, presumably in uniform and in a marked police vehicle; there is at least no evidence he was acting undercover. There is also no evidence before the Court that his identity as the officer involved in the shooting was not immediately made public, nor is there any claim that such initial disclosure of his identity violated any privacy right he had.

Rather, as disclosed by the Affidavit of Janice Brooks (attached to Doc. # 8), at some time in August, 1997, presumably after the shooting[2], "a reporter for the Dayton Daily News requested that he be permitted to review the personnel file of Police Officer Rick Smith." ¶ 3. Acting "pursuant to the Ohio Public Records law," she then made a portion of that file available to the reporter, having redacted Officer Smith's Social Security number. ¶ 4. The records which she disclosed are attached to her Affidavit, absent some records of disciplinary actions taken against Officer Smith during his career which were subsequently destroyed at his request. ¶¶ 6, 7, 8.

The information which Plaintiff claims is "personal" and should not have been released to the newspaper are his home address and "the results of his psychological and mental examinations." (Memorandum in Opposition, p. 3). Upon review of the records, the Court finds that they include a series of different home addresses for Plaintiff, as would be expected in a personnel file compiled over a twenty-year career. These presumably include his current address as of the time of the shooting incident. The records also include a self-report of a diagnosis of post-traumatic stress disorder[3] in 1993 which Plaintiff claimed was the result of his work. Although his superiors evaluated the diagnosis as non-work-related, they reassigned him to less stressful police work.

42 U.S.C. § 1983, R.S. § 1979, was adopted as part of the Act of April 20, 1871, and reads, as amended:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

The statute creates a cause of action sounding essentially in tort on behalf of any person deprived of a constitutional right by someone acting under color of state law. *Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. *Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). In order to be granted relief, a

2. The Amended Complaint avers at ¶ 10 that disclosure was made to the Daily News on August 26, 1997, which is consistent with Ms. Brooks' Affidavit.

3. This diagnosis is repeated in the expert report of Dr. Eugene Cherry filed as part of Plaintiff's Medical Package on May 18, 1999 (Doc. # 34). The Medical Package was not filed under seal. Plaintiff also complains of the release of Exhibit B to his Deposition, but there is no proof that document is among the papers released.

plaintiff must establish that the defendant deprived him of a right secured by the U.S. Constitution and the laws of the United States and that the deprivation occurred under color of state law. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Flagg Brothers Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

▮ Plaintiff has not sued any individual defendants, but the City of Dayton directly. Municipalities and other bodies of local government are "persons" within the meaning of § 1983 and may therefore be sued directly if they are alleged to have caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The policy must be deliberate and discernible. *Molton v. City of Cleveland,* 839 F.2d 240 (6th Cir.1988), *cert denied,* 489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989). To recover, a plaintiff must identify the policy, connect the policy to the political subdivision itself, and show that the particular injury was incurred because of the execution of that policy. *Garner v. Memphis Police Dept.,* 8 F.3d 358, 364 (6th Cir.1993).

Plaintiff has not identified any policy adopted by the City of Dayton itself which caused the release of these documents. Janice Brooks' Affidavit indicates the records were released pursuant to the Ohio Public Records law, Ohio Revised Code § 149.43. The Court presumes that the City had, in 1997, a policy of following the Ohio Public Records law, and that is the City policy which resulted in the release of these records.

▮ The City's behavior in 1997 reflects what was then the best understanding of what the law in general and the Ohio Public Records Act in particular required. The Act rests upon the "fundamental policy of promoting open government, not restricting it." *State ex rel. The Miami Student v. Miami Univ.,* 79 Ohio St.3d 168, 171, 680 N.E.2d 956 (1997); *State ex rel Strothers v. Wertheim,* 80 Ohio St.3d 155, 684 N.E.2d 1239 (1997). The Act is to be "liberally construed in favor of broad access." *State ex rel Wadd v. Cleveland,* 81 Ohio St.3d 50, 51–52, 689 N.E.2d 25 (1998).

▮ Under the Act, any record kept by a governmental unit must be made available for inspection by the general public, unless specifically exempted or prohibited from release by state or federal law. The burden of proving the exemption is on the governmental unit. *State, ex rel. Natl. Broadcasting Co. v. Cleveland,* 38 Ohio St.3d 79, 526 N.E.2d 786, ¶ 2 of the syllabus (1988). All doubts are to be resolved in favor of disclosure. *Id.; State, ex rel. Outlet Communications, Inc. v. Lancaster Police Dept.,* 38 Ohio St.3d 324, 528 N.E.2d 175 (1988). The statutory definition of "record" includes "any material on which a public office [could] or [did] rely." *State ex rel Mazzaro v. Ferguson,* 49 Ohio St.3d 37, 550 N.E.2d 464 (1990).

▮ Mandamus will lie and is indeed the appropriate remedy to compel a public office to disclose records. *State ex rel Steckman v. Jackson,* 70 Ohio St.3d 420, 426–27, 639 N.E.2d 83 (1994). Because a mandamus action may be brought originally in an Ohio Court of Appeals and litigants have a right to appeal to the Ohio Supreme Court, as opposed to its discretionary jurisdiction in cases originating in the Courts of Common Pleas, these cases have received a high level of attention from the Ohio Supreme Court. Resisting public entities who lose on the writ of mandamus must pay the winner's attorney fees. A brief scan of case citations under § 149.43 reveals that the newspapers have been particularly zealous in protecting their access to public records under the Act.

Prior to the time Dayton acted to release Officer Smith's records, there had

been only one binding holding which protected any information in such files constitutionally—the Ohio Supreme Court had held there is a federal constitutional right of privacy in one's Social Security number and therefore it need not be released by a public entity which possesses it as part of a public record. *State ex rel Beacon Journal Publishing Co. v. Akron,* 70 Ohio St.3d 605, 640 N.E.2d 164 (1994). Dayton complied with this ruling by redacting Officer Smith's Social Security number from the records it produced. Conversely, the Ohio courts had held, for example, that there is no constitutional privacy interest in one's arrest or conviction record, which must be released. *State, ex rel. Lippitt, v. Kovacic,* 70 Ohio App.3d 525, 591 N.E.2d 422, 425 (Cuyahoga Cty.1991).

Since Dayton acted, however, the law has changed strikingly. In *Kallstrom v. City of Columbus,* 136 F.3d 1055 (6th Cir. 1998), undercover police officers had had personal information (names, addresses, family members' names, telephone numbers, social security numbers, banks, drivers' licenses with pictures, and some other information released to defense counsel in the Short North Posse case, under a Public Records Act demand). The trial court[4] had found the Short North Posse had a propensity for violence and intimidation and one of the officers had actually received threats, but that the officers had no constitutionally protected right of privacy in the information in question. The Sixth Circuit reversed and found that there was a constitutional right of privacy in this information because its release implicated the officers' liberty "interest in preserving their lives and the lives of their family members, as well as preserving their personal security and bodily integrity." Id. at 1062. It assumed that release of public agency records to the public served a compelling state interest, but that automatically disclosing this information to any member of the public was not narrowly tailored to serve that interest. It concluded:

[W]e hold that the City's actions placed the officers and their family members in "special danger" by substantially increasing the likelihood that a private actor would deprive them of their liberty interest in personal security. Anonymity is essential to the safety of undercover officers investigating a gang-related drug conspiracy, especially where the gang has demonstrated a propensity for violence.... The City either knew or clearly should have known that releasing the officers' addresses, phone numbers, and driver's licenses and the officers' families' names, addresses, and phone numbers to defense counsel in the Russell [Short North Posse] case substantially increased the officers' and their families vulnerability to private acts of vengeance.

Id. at 1067. The Court also held that the officers had a right to notice and a right to be heard before any such information was released in the future.

The Ohio Supreme Court has accepted the ruling in Kallstrom as authoritative and has now held on its own authority that personal information such as addresses, family members' names, and telephone numbers are protected from disclosure under the Public Records Act. *State ex rel Keller v. Cox,* 85 Ohio St.3d 279, 707 N.E.2d 931 (1999). At the same time, the court held

On the other hand, any records needed by a defendant in a criminal case that reflect on discipline, citizen complaints, or how an officer does his or her job can be obtained, if any exist, through internal affairs files in accordance with the previous decisions of this court.

85 Ohio St.3d at 282, 707 N.E.2d at 934.

■ In *Kallstrom,* the Sixth Circuit held the City of Columbus could be liable despite the fact that it, like the City of Dayton here, was carrying out an unconstitutional state-created policy, rather than its own policy. While it seems anomalous

---

4. The Honorable George Smith, District Judge for the Southern District of Ohio.

to hold a city liable for following a mandatory state law which had not yet been declared unconstitutional, the Sixth Circuit did not pause on this question. This Court accordingly assumes a municipality may be held liable under § 1983 for carrying out an unconstitutional state law, even though the law has not yet been held unconstitutional[5].

■ Nevertheless, the *Kallstrom* court did not hold that **all** police officer personnel information was constitutionally protected, but merely information of the sort likely to facilitate intrusion on the liberty/security interests of officers, to wit, personal identifying information such as names, addresses, phone numbers, Social Security numbers, drivers' licenses, and similar information for officers' family members. That is one of the types of information released in this case. Specifically, the file includes Plaintiff's own addresses, including presumably the place where he lived at the time of the shooting, his unlisted phone number and the name, address, and phone number of his brother. Furthermore, the information was released without notice to Officer Smith and an opportunity to assert his privacy right. Therefore, in releasing this information, the City violated both Officer Smith's substantive and procedural due process rights under the Fourteenth Amendment. *See Kallstrom*, 136 F.3d at 1067.

■ However, the City did not violate Officer Smith's privacy interests in releasing his diagnosis of post-traumatic stress disorder. While this information is personal and perhaps embarrassing to have made public, it does not come within the rationale of *Kallstrom*. That is, it is not the kind of information which, when released to the public, including those persons who may have a special motive to dislike a particular officer, makes it more likely that the officer's security or that of

his family will be invaded by such persons. It does not enable them to know where the officer or his family lives. It is no more likely to heighten their dislike than release of disciplinary records. And it may be important to the compelling state interest in open government which grounds the Public Records Act, in a way that the identifying information is not. For example, if a police officer has a psychiatric diagnosis which makes him a greater risk to the public because he is armed, the public has an interest in knowing about the diagnosis and any treatment and prognosis.

In *Kallstrom*, the Sixth Circuit reaffirmed its holding in *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (1981), relying on *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), that not every privacy interest in government-held information rises to a constitutional level. *Paul v. Davis* also continues to be good law. This Court accordingly holds that the release of Officer Smith's psychiatric diagnosis did not violate his constitutional right to privacy.

■ Although Plaintiff has shown a violation of his constitutional rights in release of the personal identifying information described above, he cannot recover damages for that violation because he is unable to show the violation caused any damages[6]. The damage he claims arises from the fact that his life was threatened indirectly by Lance Bacher, the brother of the decedent. However, the evidence establishes that this threat is far different from the threats in *Kallstrom* and there is no proof it was caused in any way by the release of information.

First of all, the information was released to the Dayton Daily News. There is no proof offered that the Daily News ever

---

5. This is not a case where a city was carrying out a. state law which had already been held unconstitutional, which would clearly come within § 1983. Nor does the City of Dayton claim any immunity here on grounds the law was not clearly established. Rather, it ac-

knowledges that no immunity defense is available to a municipality.

6. Plaintiff seeks only compensatory damages in this case, not any injunctive relief.

published Officer Smith's home address or any other protected information [7]. In the *Kallstrom* case, the identifying information had been released directly to defense counsel and there was evidence they had passed it on to their clients.

Secondly, Mr. Bacher's threat is a far different thing from the threats in *Kallstrom*. In that case the threats were made directly to plaintiff officers or members of their families. In this case, Mr. Bacher was a subordinate employee of Mr. David Rado and went to Rado to talk about his upset over his brother's death about a week after it happened. He was very upset and angry. Among the things he said to Rado were that if he found the officer who did this, he would "take care of him, and if he couldn't take care of him, he knew some people who could." (Rado Depo., p. 9). Nothing that the City released led Bacher to Rado; rather, they were co-employees. More importantly, Bacher did not know at the time that Rado was a friend of Smith, so he had no way of knowing that his threat would be passed along to Smith. Rado did not tell Bacher that he knew Smith.

It was only in their first conversation about the incident that Bacher made any threats. As time went on and he continued to discuss the matter with Rado, he said he was "beginning to understand that the police officer had done what he had to do and that was okay." (Id., pp. 12–13, p. 15). He later learned that Rado knew Smith and was upset that Rado had not told him (Id., p. 14). However, he never made another threat against Smith after the first conversation.

There is no proof Mr. Bacher has a propensity for violence, like the Short North Posse. There is no proof he attempted to make a threat to Officer Smith, since he had no idea Rado could pass a threat along. Once he learned Rado knew Smith, he made no more threats; in fact, he had only made the threats once and

said he had come to understand the officer did what he had to do even before he learned that Rado knew Smith. Thus the risk of harm to Officer Smith from Mr. Bacher is far less substantial than the risk the Kallstrom plaintiffs faced from the Short North Posse. It is difficult to believe a seasoned police officer would suffer much emotional distress from as attenuated a threat as Mr. Bacher represented.

█ Of course, emotional distress need not be severe to be compensable under § 1983. *Chatman v. Slagle*, 107 F.3d 380 (1997). However, the distress must have been proximately caused by the constitutional violation. There is simply no proof offered by Plaintiff of any causal connection between the release of personal information and any **heightened** threat from Mr. Bacher. Even when a police officer does his unquestioned duty, as Officer Smith did here, the family and friends of a person shot in the course of duty may not see it that way. The motion papers indicate the decedent's girlfriend sued Officer Smith within a week of the shooting and it is not unreasonable for him to fear vengeance. Indeed, Mr. Bacher's expression of a desire for vengeance is not an unexpected incident of his grief at his brother's death. But nothing the City did made the taking of vengeance more likely.

Defendant's Motion for Summary Judgment is GRANTED. The Clerk will enter judgment dismissing the Amended Complaint with prejudice.

---

7. If it had done so, that proof would be readily available from back issues of the newspaper.